AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
4/12/2021
CENTRAL DISTRICT OF CALIFORNIA
BY:    eva    DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**

Apr 12, 2021

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY   Nancy Boehme
Deputy Clerk, U.S. District Court

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>EDDY REYES,<br><br>Defendant. | Case No.   8:21-mj-00249-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 6, 2016 in the county of Orange in the Central District of California, the defendant violated:

|            *Code Section*        |       *Offense Description*       |
|----------------------------------|-----------------------------------|
| 18 U.S.C. § 1201(a)(1).          | kidnapping                        |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Farshid Hashempour*
*Complainant's signature*

Farshid Hashempour, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    _____April 12, 2021_____

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state:    Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA Greg Staples
(213) 393-7795

TABLE OF CONTENTS

DESCRIPTION                                                    PAGE

I.    INTRODUCTION.............................................1

II.   PURPOSE OF AFFIDAVIT.....................................2

III.  SUMMARY OF PROBABLE CAUSE...............................3

IV.   STATEMENT OF PROBABLE CAUSE.............................7

      A.    REYES' Trips to El Salvador to Engage in Sex with
            Claudia Reyes When She Was a Minor...............7

      B.    The Last Sighting of Claudia Reyes by Coworkers..9

            1.    Missing person reports filed by REYES and a
                  coworker...................................9

            2.    Interview with coworker Eunice Ayala.......10

            3.    Interview with coworker W-1...............11

            4.    May 17 phone call from REYES to SAPD.......12

            5.    May 17 interview with REYES' brother and
                  mother....................................12

            6.    May 17 interview with law office employee who
                  received texts the day after Claudia's
                  disappearance.............................14

            7.    May 17 interview of Maria Elena Ayala......14

            8.    May 17 interview of Bush Street apartment
                  manager...................................15

            9.    May 17 search of Bush Street apartment.....16

            10.   May 17 interview of Bush Street neighbor
                  Alejandra Gallegos........................17

            11.   May 17 interview of coworker W-1..........17

            12.   May 18 interview of REYES at his attorney's
                  office....................................18

            13.   May 19 interview of Bush Street apartment
                  manager...................................19

            14.   May 19 interview of W-1...................20

TABLE OF CONTENTS (CONTINUED)

<u>DESCRIPTION</u>                                                              <u>PAGE</u>

15.  May 19 interview with coworker Magdalena Barajas....................................21

16.  May 19 interviews with church friend Merari Chavez and Pastor Fernando Sowa............22

17.  May 19 drive to LAX parking structure by REYES .......................................25

18.  Discovery of Claudia Reyes' blood in Hyundai SUV rented and driven by REYES.............25

19.  May 20 surveillance of REYES driving from Orange to Los Angeles to buy two 11-pound bags of laundry detergent......................27

20.  May 21 interview of W-1....................28

21.  May 23 search of defendant's trash........30

22.  May 23 search of Hyundai SUV by cadaver dog.......................................30

C.  REYES Sets Up Robbery of Claudia's Cell Phone...31

D.  May 26 trip to Palmdale by REYES and Pablo Orellana........................................36

E.  Cell Site Data Showing the Movement of Cell Phones Belonging to REYES and Claudia from May 6 through May 8, 2016............................38

F.  REYES and Claudia Were Scheduled to Move to a New Apartment on May 8, 2016........................42

G.  GPS Coordinates Show Claudia's Cell Phone Not Active on May 18................................43

H.  Interview of USCBP Employees....................44

1.  REYES hired a USCBP coworker to follow Claudia .........................................44

2.  Interviews with Café 301 Employee K.R......48

3.  Interviews with other USCBP employees......50

TABLE OF CONTENTS (CONTINUED)

DESCRIPTION                                                    PAGE

   I.    REYES' History of Domestic Violence and Abuse...52

        1.    REYES' threats to kill Claudia; other evidence
             of abuse..................................52

        2.    August 28, 2014, Temporary Restraining Order
             against REYES............................55

        3.    February 28, 2016........................56

        4.    February 29, 2016........................56

        5.    March 4, 2016............................56

        6.    Three calls on March 5, 2016.............57

        7.    March 15, 2016 TRO.......................58

   J.    Claudia's Facebook Account Changed Prior to Her
        Disappearance................................60

   K.    Report of Sighting of Claudia on May 8, 2016....61

   L.    REYES' meeting with Pablo Orellana After Police
        Interview Orellana...........................64

   M.    REYES' Remarriage in April 2017.................69

   N.    REYES' Failed Polygraph Examination in November
        2015.........................................70

   O.    April 2016 Letter from REYES to ICE Withdrawing
        Application for Residency for Claudia..........72

   P.    Probable Cause as to the SUBJECT PREMISES.......74

        1.    SUBJECT PREMISES 1.......................74

        2.    SUBJECT PREMISES 2.......................76

V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........78

VI.  CONCLUSION.........................................83

**AFFIDAVIT**

I, Farshid Hashempour, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Detective with the Santa Ana Police Department ("SAPD") and a federally deputized Task Force Officer ("TFO") presently working with the Federal Bureau of Investigation ("FBI").  As a TFO with the FBI, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.   I am assigned to the FBI's Orange County Violent Gang Task Force ("OCVGTF").  The OCVGTF is composed of federal and local law enforcement agencies, including, but not limited to, the FBI, the Internal Revenue Service-Criminal Investigation, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the SAPD, and detectives from the Anaheim Police Department.  The OCVGTF is responsible for, among other things, investigating violations of federal law committed by criminal street gangs, the Mexican Mafia, and other violent criminal organizations in Orange County.  In this capacity, I have participated in numerous criminal investigations to include narcotic trafficking, violent assault, extortion, and homicide.  In addition to this assignment with the FBI, I have been a SAPD Police Officer and have been so employed for approximately nineteen years.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.     This affidavit is made in support of a criminal complaint against, and arrest warrant for, Eddy REYES ("REYES") for a violation of 18 U.S.C. § 1201(a)(1) (kidnapping).  This affidavit is also made in support of search warrants for the following locations:

a.     20983 East Covina Boulevard #E, Covina, California ("SUBJECT PREMISES 1"), described in Attachment A-1, and

b.     835 South Park Vine Street, Orange, California ("SUBJECT PREMISES 2"), described in Attachment A-2, for the items to be seized described in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

5.     The federal kidnapping statute, 18 U.S.C. § 1201(a)(1), provides, in pertinent part, as follows:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts or carries away and holds for ransom or reward or otherwise . . . when the person . . . uses the mail or any means, facility, or instrumentality of foreign or interstate commerce in committing or in furtherance of committing the offense . . . shall be punished for any term of years or life and, if the death of any person results, shall be punished by death or life imprisonment.

As discussed below, there is probable cause to believe REYES, an employee of the United Stated Customs and Border Protection ("USBCP"), used cell phones, a Facebook account, and a rental car in furtherance of the kidnapping and killing of his wife, Claudia Reyes.  The use of a cell phone in furtherance of a kidnapping satisfies the interstate commerce requirement for federal jurisdiction even where the crime occurred in one state. United States v. Morgan, 748 F.3d 1024, 1031 (10th Cir. 2014) (use of cellular telephone during intrastate kidnapping satisfies interstate commerce requirement of kidnapping statute); see also United States v. Randolph, 93 F.3d 656, 660 (9th Cir. 1996) (cars are instrumentalities of interstate commerce for purposes of federal carjacking statute), abrogated on other grounds by United States v. Holloway, 526 U.S. 1 (1999).

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.  Claudia Reyes was last seen alive by coworkers on the night of Friday, May 6, 2016, when she left her job at an El Pollo Loco and got into a rented SUV driven by her husband,

Eddie REYES.  Since that time no one, including Claudia's child,
parents, coworkers, or friends, has heard from her or learned
what happened to her.

7.    During the day of May 6, a coworker at El Pollo Loco
heard Claudia speaking to REYES on the phone.  REYES and Claudia
were heard arguing, and REYES was later heard apologizing.
REYES persuaded Claudia he would take her out dancing that night
over Claudia's objection that her clothes were packed for a
move.  When she left work that night, Claudia told a coworker
that REYES was waiting outside and that she did not want to go
out dancing because they had to move to their new apartment in
Anaheim and her clothes were already packed.  The family was
scheduled to move to a new apartment two days later, on Sunday,
May 8.

8.    Instead of taking Claudia dancing, REYES took her to
the home of his mother, Maria Orellana, where Claudia had left
their four-year-old son for babysitting on her way to work
earlier that day.  (As discussed below, Claudia opposed leaving
the boy with Orellana, and on May 6 had asked two neighbors if
they could babysit before taking the child to Orellana's home.)
Maria Orellana hated Claudia, and once told her that she and
REYES could kill Claudia and take her child.  It was that night,
or early the following morning, that Claudia was killed.  While
Claudia and her son were seen on surveillance video leaving the
couple's apartment building the morning of May 6 as she left for
work, she was never seen again on the video, including the
following afternoon when records show her phone, along with

4

REYES' phone, went from Maria Orellana's home to the couple's apartment.  The only trace of Claudia found since that night was a drop of her blood in the SUV REYES had rented, and the scent of a dead body in the back seat and rear storage area of the SUV, detected by a cadaver dog.

9.   REYES brought Claudia to this country from her home in El Salvador.  REYES met Claudia on a trip to El Salvador in 2011 with his half-brother, Pablo Orellana, a son of Maria Orellana. Pablo Orellana had a girlfriend there who was related to Claudia.  REYES was 25 years old when he met Claudia.  She was sixteen.  Thereafter, REYES made numerous trips to El Salvador to visit, and have sex with, Claudia.  REYES impregnated Claudia while she was still 16 years old.  He subsequently married Claudia in El Salvador and brought her and their son E. to the United States in 2014.

10.  REYES physically and mentally abused Claudia.  In one instance, REYES paid a stranger $300 to steal Claudia's cell phone from her while she waited at a bus stop after work.  REYES told a coworker, whom he also asked to steal the phone, that the phone had incriminating evidence about him that could ruin his career.  REYES later asked the man who stole the phone, a sign-twirler for a business near Claudia's work, to plant cocaine on Claudia.  Prior to her disappearance, REYES made several threats to kill Claudia rather than let her be with another man.

11.  When she left work on the night of Friday, May 6, 2016, Claudia was described by one coworker as anxious and distracted that day.  REYES had rented the Hyundai Santa Fe he

drove that night, though he previously told Claudia he bought it for her.

12.   Claudia was scheduled to work the following day, Saturday, May 7.  A coworker received a text from Claudia's phone that day asking the coworker to tell the boss that she was sick and would not be in for a few days.  The coworker thought the text was strange because it was sent to her instead of the boss, as was usually done, and referred to the boss as "patrona."  According to the boss, who saw the text, and coworker, Claudia never used that word when referring to the boss, and instead used the word "jefa."  At the same time, others, including Claudia's mother in El Salvador, received texts from Claudia's phone stating that she had been "sleeping around" and met someone, she no longer loved her son or REYES, and was leaving for New York with a man, whom in one text she described as an American with blue eyes.  The text to Claudia's mother said Claudia was taking a bus to New York and she would not have a phone connection for several days.  Repeated pleas from her mother for Claudia to respond were never answered.  The persons who received the texts regarded them as suspicious and out of character for Claudia, whom they described as devoted to, and over-protective of, her son and would never leave him.

13.   Four days after Claudia failed to show up at work on Saturday, May 7, REYES filed a missing person report with the Santa Ana police.  However, when an investigator called REYES to get more information about his missing wife, REYES would not cooperate and told the investigator he would not talk to her

without his lawyer.  When the investigator explained she was only responding to the missing person report he filed, REYES became upset, told the investigator she would hear from his lawyer, and hung up.

14.  When interviewed later at his lawyer's office, REYES claimed he had last seen Claudia the night of Saturday, May 7, when he dropped her off at a McDonald's in Santa Ana, where he said she was meeting friends to go "clubbing."  When Claudia did not return or call the following morning, which was Mother's Day, REYES said he left for a planned camping trip with his mother, son, and half-brother Pablo Orellana in the rented SUV. In a subsequent search of the SUV, a drop of Claudia's blood was found, and a cadaver dog alerted to the backseat and rear compartment, indicating a dead body had been in those areas.  To this day, law enforcement has not found Claudia.

15.  Based on these facts, and others discussed below, there is probable cause to believe that REYES kidnapped Claudia by inveigling or decoying Claudia with a promise to take her dancing, and instead taking her to the home of his mother where Claudia was murdered.

IV. **STATEMENT OF PROBABLE CAUSE**

A.  **REYES' Trips to El Salvador to Engage in Sex with Claudia Reyes When She Was a Minor**

16.  On or about May 15, 2018, FBI Special Agent ("SA") George Boykins and I interviewed Claudia Reyes' parents, Rosa Ponce and Pablo Sanchez, in the lobby of the Courtyard Marriot in San Salvador, El Salvador.  Katherine Arriaza, who was

assigned to El Salvador's Transnational Anti—Gang Unit ("TAG"), assisted with the Spanish translation.

17.  Rosa said that REYES originally met Claudia through Rosa's niece, Noemi Ponce, who was dating REYES's half—brother, Pablo Orellana.  According to Rosa, on one occasion, REYES met Claudia when he accompanied Pablo Orellana on one visit to Rosa's niece.  Rosa said Claudia was 16 years old at the time. Rosa said that after they first met, REYES would come to visit, and have sex with, Claudia in El Salvador every forty to sixty days.  Rosa told us that Claudia became pregnant with their son, E., who was born on March 1, 2012.  This means E. was potentially conceived in early June 2011 when Claudia was only 16 years old and REYES was 25 years old.

18.  A review of REYES' international travel records provided by USCBP shows REYES travelled to El Salvador five times in 2011 and three times in 2012.

### 1.   Death threat to Claudia from REYES" mother

19.  On March 12, 2021, FBI SA Luis Altamirano interviewed Rosa Ponce by telephone concerning Claudia's relationship with Maria Orellana, REYES' mother.  Rosa said that Claudia had a very bad relationship with her mother-in-law.  According to Rosa, Claudia would sometimes call crying because of how she was being treated by REYES and his mother.  Claudia told Rosa that Maria did not like her and was told by Maria that she was not worthy of being married to REYES.  Rosa said that Maria one time tried to hit Claudia, which caused Claudia to lock herself in her room with her son E.  Rosa said that on one occasion Maria

Orellana told Claudia that they (presumably referring to REYES and her) could kill her and take her child from her.  When asked what would have prompted REYES' mother to say this, Rosa said that Maria did not want Claudia to be with REYES and therefore treated Claudia badly.  When they lived in Maria Orellana's home (SUBJECT PREMISES 2), Maria would not let Claudia do any household work for REYES, such as laundry or cooking.

20.  Rosa also said that Maria Orellana did not like E., which is why Claudia did not want to leave her son with her. Rosa said that Maria charged Claudia money to babysit E.  (As noted below, on May 6 Claudia dropped E. off at Maria Orellana's home on her way to work.  But she had tried first to find neighbors to babysit E. rather than take her to Orellana's home.

21.  Rosa said she only met Maria Orellana once when Maria visited El Salvador after REYES and Claudia were married.

**B.   The Last Sighting of Claudia Reyes by Coworkers**

22.  The last time Claudia Reyes was seen by coworkers was Friday, May 6, 2016.  According to coworkers at the El Pollo Loco at 12909 Harbor Boulevard in Garden Grove, Claudia left at the end of her shift, at 8:03 p.m., and got into an SUV driven by REYES.

1.   <u>Missing person reports filed by REYES and a coworker</u>

23.  On Wednesday, May 11, 2016, at about 11:00 p.m., REYES went to the SAPD to file a missing person report for Claudia. SAPD Officer Hahm met with REYES, who said he had last spoken with Claudia on May 7, 2016, at approximately 10:45 p.m., before

Claudia went "clubbing" with friends whom REYES did not know. In his police report, Officer Hahm wrote that he called Claudia's cell phone three times, but the cell phone appeared to be turned off as the calls went straight to voicemail.  Officer Hahm left a message asking Claudia to call the SAPD because her husband had reported her missing.  Claudia never returned the call.

24.  The following day, May 12, 2016, a man who initially identified himself as Daniel Z. arrived at SAPD to also report Claudia Reyes missing.  In a later interview, Daniel Z. admitted his real name, but is identified here as W-1 due to safety concerns.  As described below, W-1 worked with Claudia at the El Pollo Loco.  W-1 told SAPD Officer A. Lopez that Claudia was a victim of domestic violence and that he was concerned for her safety because she had not reported to work in the past four days.

### 2.  Interview with coworker Eunice Ayala

25.  On May 16, 2016, SAPD Police Investigative Specialist Debbie Velarde-Reyes interviewed Claudia's coworker, Eunice Ayala, by telephone.  Eunice last spoke with Claudia while visiting her at work on May 6, 2016, at about 3:00 p.m.  Eunice saw Claudia briefly that day and described her as anxious and preoccupied.  According to Eunice, REYES told Claudia he wanted to take her out dancing that Friday night, May 6, 2016.  Eunice said that REYES was insistent that Claudia go with him.  Eunice told Velarde-Reyes that a co-worker, W-1, overheard REYES telling Claudia that he had a big surprise for her.

26.   Eunice said that the next day she received a text
message from Claudia's new phone number asking Eunice to tell
their manager, Maria Elena Ayala, that she was sick and would
not be into work for the next few days.  Because such requests
were usually made directly to a supervisor, Eunice replied that
Claudia should inform the supervisor directly.  According to
Velarde-Reyes' report, when Claudia did not respond to Eunice's
text message, Eunice tried calling Claudia but the calls went
directly to voicemail.  Eunice said a coworker named Magdalena
told her about an argument she overheard between Claudia and
REYES over the phone on Friday, May 6.  REYES called Claudia
back later and asked for forgiveness, saying he wanted to take
her out to dinner.  Magdalena said Claudia told REYES she did
not want to go out because they were scheduled to move out of
their apartment the next day and all her clothes were packed.

### 3.   Interview with coworker W-1

27.   Specialist Velarde-Reyes then contacted W-1, noted
above, who had filed a missing person report.  W-1 said he was
Claudia's friend and coworker.  W-1 said Claudia had retained an
attorney, Daniel March, because she could no longer tolerate
REYES' abuse.  W-1 said when Claudia met with the attorney, she
learned that REYES had filed for divorce in 2014.  W-1 knew that
Claudia had obtained a restraining order against REYES, which W-
1 said REYES would continually violate by showing up to
Claudia's work with flowers and going to their apartment in
Santa Ana.

      4.   <u>May 17 phone call from REYES to SAPD</u>

28.  On or about May 17, 2016, Specialist Velarde-Reyes received a call from REYES, following several messages she had left for REYES.  According to Velarde-Reyes' report, REYES sounded agitated and spoke rapidly.  REYES apologized for not returning Velarde-Reyes' calls sooner and said he was not feeling well as he was dealing with diarrhea and vomiting the past few days.  REYES said he last saw Claudia at the McDonald's located at 17th Street and Grand Avenue in Santa Ana.  Velarde-Reyes told REYES that there was no McDonald's at that intersection, but that there was one at the intersection of 17th Street and Lincoln Avenue.  Velarde-Reyes asked REYES if the couple's son was with Claudia.  REYES then told Velarde-Reyes that he thought he should talk to his attorney before answering any more of her questions.  Velarde-Reyes told REYES she was conducting a missing person investigation that required his cooperation to locate his wife.  REYES then raised his voice, told Velarde-Reyes he would have his attorney call her, and hung up.

      5.   <u>May 17 interview with REYES' brother and mother</u>

29.  On May 17, 2016, Specialist Velarde-Reyes told SAPD Homicide Detective Judson that REYES refused to provide any details concerning his wife or son.  According to Detective Judson's report, he and Detective J. Garcia drove to the home of REYES's mother, Maria Orellana (SUBJECT PREMISES 2), to conduct a follow-up investigation and locate the child.  The Detectives knocked on the door, which was answered by a man who identified

himself as REYES' brother, Roy.  Roy Reyes told the Detectives
that REYES would not be home until 5:00 p.m.  While speaking to
Roy, the Detectives noticed an elderly woman and young child
standing inside the doorway.  Roy explained that the young child
was REYES' son, E., who was being cared for by his grandmother,
later identified as Maria Orellana.

30.  The SAPD Detectives told Roy that REYES had filed a
missing person report that they wanted to discuss with him.
When asked by the Detectives if he was aware of the report, Roy
replied that he was "trying to stay out of everything" and
"there's stuff going on."  The Detectives briefly spoke to Maria
Orellana, who said that she did not have a lot of information
regarding the problems between REYES and Claudia.  Maria said
she last saw Claudia on Friday, May 6, 2016, when Claudia
dropped off E. at SUBJECT PREMISES 2 so Maria could watch him.
Maria expected Claudia to return later the same day to pick up
E.  Shortly thereafter, Roy interjected and told the Detectives
that he no longer wanted them speaking to him or his mother.
Approximately 20 minutes after the interviews of Roy Reyes and
Maria Orellana ended, Detective Judson received a phone call
from attorney Marlin Stapleton, who said he represented REYES
and would advise when REYES was ready to make a statement to
police.

6.   <u>May 17 interview with law office employee who
received texts the day after Claudia's
disappearance</u>

31.  On May 17, 2016, SAPD Detectives McClaskey and Duran
went to the Law Offices of Daniel S. March & Associates in

Tustin.  According to Detective Duran's report, they spoke to
Olga Esquivel, who worked as a Spanish translator for the
office.  Olga met Claudia for the first time at the law office
in January 2016.  Olga had several meetings with Claudia, with
the last occurring at Claudia's apartment on May 1, 2016.  Olga
said she received five text messages from an unknown number
between 7:48 p.m. and 7:50 p.m. on Friday, May 6.  (Call detail
records for Claudia's phone show five texts to Olga's number on
May 7 at 3:17 p.m.)  Although Olga had previously deleted the
text messages she had received, she remembered the content of
the text messages.  The sender wrote that she did not love her
husband and son, and was leaving everything with REYES because
she had been sleeping around.  The sender of the text asked Olga
to tell Daniel March that his services were no longer needed
because she had met somebody and was going to New York.

      7.  <u>May 17 interview of Maria Elena Ayala</u>

    32.  On May 17, 2016, SAPD Homicide Detectives Duran and
Nunez went to the El Pollo Loco to interview Claudia's
supervisor, Maria Elena Ayala.  Maria told the Detectives that
Claudia had worked there for approximately six months.  Maria
confirmed that Claudia was last at work on Friday, May 6, 2016,
and that she did not show up for her shift the next day.  Maria
described Claudia as a reliable and responsible employee who
always called when running late or if she was unable to work.

    33.  Maria said that when Claudia's coworker, Eunice Ayala,
arrived for work on Saturday, May 7, 2016, Maria told Eunice
that Claudia had not arrived for her shift.  Eunice then

described the strange text she received from Claudia's phone that day asking Eunice to tell Maria that she would not be at work for the next few days.  Maria explained to the Detectives that the text message was strange because the sender used the Spanish word "patrona," which means "boss" in English.  Maria recalled that Claudia had never referred to her as "patrona," but instead would address her as "jefa."  Maria became concerned and tried to call Claudia several times, but she did not answer.  Maria also tried to call REYES, who also never answered the phone.

        8.  <u>May 17 interview of Bush Street apartment manager</u>

    34.  On May 17, 2016, SAPD Homicide Detectives Gomez and Elms went to an apartment complex located at 2015 North Bush Street in Santa Ana to speak to apartment manager Octavio Plata. REYES, Claudia, and E. lived in apartment #107 in the complex at the time of her disappearance.  According to the police report, Plata said he was aware of a restraining order against REYES. Plata told the Detectives that he had not seen REYES at the apartment since the time the restraining order was obtained until May 6, 2016, when he recalled seeing Claudia with REYES at their apartment.  Plata thought it was unusual to see REYES at the apartment since he had not been there recently.  Plata said REYES returned to the apartment on May 15, 2016 to remove their property from the apartment, leaving the apartment completely empty except for trash.  Plata noticed that REYES appeared to take extreme care when he moved the couch out of the apartment. Plata had not seen Claudia since May 6, 2016.

35.   Later that same day, May 17, 2016, REYES arrived at the apartment complex at 2015 North Bush Street.   When told this by the apartment's managerial staff, Detective Gomez went to the location.   According to Detective Gomez, he encountered REYES, who was holding a bucket for cleaning and asked to enter the apartment.   Detective Gomez denied his request due to the ongoing investigation into Claudia's disappearance.

### 9.   May 17 search of Bush Street apartment

36.   On May 17, 2016, Detective Judson obtained and executed a warrant to search REYES and Claudia's apartment on Bush Street.   SAPD Crime Scene Investigator Perez processed the apartment for any signs of blood.   A Leucocrystal Violet exam was used to detect blood, which resulted in a positive reaction in the kitchen sink;[1] however, an insufficient amount of DNA was recovered for testing.   A swab collected possible blood in the bathroom sink.   Analysis showed that Claudia could not be excluded as a minor contributor to the DNA profile from the swab from the bathroom sink.

---

[1] Based on my training and experience, I know that Leucocrystal Violet ("LCV") is a coloring reagent used to detect the presence of blood.   LCV reacts with the hemoglobin in the blood and produces a violet color.   LCV is used to enhance and develop fingerprints, and/or shoeprints that may have been deposited in suspected blood.   It is also used as a searching tool for trace blood in areas that blood is not visible.   The violet color will provide contrast to the bloodstains and/or patterns.   LCV can have false positive results which can include certain plant materials, and metals such as iron or copper.   LCV generally does not destroy DNA.

          10.   May 17 interview of Bush Street neighbor
                 Alejandra Gallegos

37.  On May 17, 2016, Detectives Gomez and Elms contacted Alejandra Gallegos, who lived in apartment #219 at 2015 North Bush Street.  Per the police report, Gallegos said she occasionally babysat E. for Claudia and REYES.  Gallegos said the last time she watched E. was on April 29, 2016, and the last time she saw Claudia was a week later on May 6th.  That day, when she was getting into her car in the parking garage, Gallegos saw REYES and Claudia in passing but did not speak with them.  Gallegos said she became friends with Claudia, who told Gallegos that REYES was verbally abusive and at times would not provide food for E. or her.  Gallegos said she bought food for Claudia and E. on several occasions because REYES did not provide for them.  Gallegos learned of Claudia's disappearance when she received a Facebook message from Claudia's mother, Rosa Ponce, asking her if she had seen Claudia.  Gallegos replied she had not seen Claudia.  Gallegos and another neighbor, Maricela Mendoza, had knocked on the door to Claudia's apartment, but no one answered.

          11.  May 17 interview of coworker W-1

38.  On May 17, 2016, SAPD Homicide Detectives Zaragoza and Duran interviewed Claudia's coworker, W-1, at the El Pollo Loco restaurant.  According to the police report, W-1 said he met and became friends with Claudia while working at the restaurant.  W-1 told Detectives that over time Claudia would confide in him about REYES' verbal and psychological abuse, which included one

incident of physical assault that caused her to bleed. According to W-1, Claudia and REYES' marital issues led to a brief separation that ended in late April 2016, only days before her disappearance, when REYES convinced Claudia to give him a second chance.  Claudia had told W-1 that she and REYES were going out on Friday night, May 6, but W-1 did not know where they were going.  W-1 said he last worked with Claudia on Tuesday, May 3, when he saw REYES arrive in a newer model silver Hyundai SUV.  At the end of the interview, W-1 said that Claudia told coworker Eunice Ayala that REYES threatened Claudia that he would rather see her dead than with another man.

> 12.   May 18 interview of REYES at his attorney's office

39.  On May 18, 2016, REYES was interviewed by SAPD Homicide Detectives at the office of his attorney, Marlin Stapleton.  According to the interview report, and the recording of the interview, REYES told Detectives that he had last seen Claudia on Saturday, May 7, at about 10:45 p.m., when he dropped her off at the McDonald's parking lot at 1011 East 17th Street in Santa Ana.  According to REYES, Claudia told him she was going dancing with her girlfriends.  REYES said that he dropped Claudia off and watched her get into a black-colored SUV being driven by an unknown female.  When Claudia did not call the following day, REYES left for a pre-planned camping trip to "Salvation Mountain" in Calipatria, near the Salton Sea.  REYES said he waited until Wednesday, May 11, 2016, to report Claudia missing on the advice of his family law attorney.

40.  On May 18, 2016, at approximately 10:15 p.m.,
Detective Judson called Claudia's cell phone number.  The call
went straight to voicemail and a female's voice could be heard
stating it was Claudia's cell phone.  At the time of the call,
it appeared that the cell phone was still activated.

13.  May 19 interview of Bush Street apartment manager

41.  On May 19, 2016, Detectives Garcia and Gomez went to
the Bush Terrace Apartments at 2015 North Bush Street to speak
again to apartment manager Octavio Plata.  Per their report,
Plata told Detectives that REYES was supposed to turn in his
apartment key on May 7, 2016, but did not come in.  Instead,
REYES came in on May 17 and told Plata that he could not come on
May 7 due to work obligations that had taken him to Palmdale for
a week and then to Glendale for another two days.  (During the
interview at his attorney's office, discussed above, REYES said
he dropped Claudia off at a McDonald's on May 7 and went on a
camping trip the following day.)  During their conversation,
REYES asked Plata for the deposit check he was due once he
turned over the keys.  Plata told REYES that since Claudia was
also listed on the lease, her name would also be on the check.
When REYES asked Plata if the check could be made to his name
only, Plata replied that he could do so only if Claudia came in
and authorized it.  Plata said that REYES became visibly upset
and told Plata that Claudia would not be returning.  REYES told
Plata that Claudia had left him and their son to go clubbing and
had not returned.  Plata became suspicious by this comment

because he knew Claudia to be overprotective of her son, E., and was not the type to leave him behind.

42.  Plata also said he knew Claudia and REYES for two years and described REYES as a jealous person.  Plata recalled a time when he sent notices to all the tenants to inform them of a scheduled inspection by the Fire Marshal.  At the time of the inspection, Plata knocked on the REYES' door and did not get an answer.  Thinking nobody was at home, Plata opened the door to the apartment and found Claudia and E. sitting on the couch.  When Plata asked Claudia why she did not answer the door, Claudia said that REYES would not allow her to answer the door when he was not home.

43.  With respect to REYES' claim that he was in Palmdale and Glendale for work and thus could not turn in his apartment key on May 7, 2016, I contacted Senior Special Agent ("SSA") Araceli Trevino with USCBP's Office of Professional Responsibility.  SSA Trevino told me that REYES was not scheduled for any work-related trips to Palmdale or Glendale on or around May 7, 2016.

### 14.  May 19 interview of W-1

44.  On May 19, 2016, Detectives Zaragoza and McClaskey conducted a follow-up interview with W-1.  According to the police report, W-1 was reminded of their previous interview on May 17, 2016, and told that it was important that he be truthful and forthright.  W-1 said he lied about his relationship with Claudia because he did not want his family finding out.  W-1 said that he was romantically involved with Claudia during the

time she was separated from REYES and that they had sexual
intercourse once at her apartment.  W-1's wife eventually found
out and called Claudia to tell her that W-1 was married,
something W-1 said Claudia did not know at the time of their
involvement.  After his wife found out about their relationship,
W-1 decided to stay with his wife and ended his romantic
relationship with Claudia.  Shortly thereafter, Claudia
reconciled with REYES.  When asked about the Silver Hyundai SUV
he had seen REYES driving, W-1 said that Claudia believed REYES
bought it to get her back with him.  W-1 could not remember
whether the vehicle had dealer paper plates or a license plate,
but said it was a newer model.

     15.  <u>May 19 interview with coworker Magdalena Barajas</u>

    45.  On May 19, 2016, Detectives Capacete and Gomez went to
the El Pollo Loco to speak to one of Claudia's coworkers,
Magdalena Barajas.  According to the police report, Barrajas
said she had known Claudia for about six or seven months from
working with her at the restaurant.  She was working with
Claudia on Friday, May 6, 2016.  At approximately 8:00 p.m.,
Claudia told Barrajas that her shift was over and that she
needed to leave because REYES was waiting for her outside.
Claudia told Barrajas that she was working the next day starting
at 3:00 p.m.  Barrajas was busy with customers and did not see
whether Claudia left with REYES.  Barajas said she received a
Facebook message from REYES on May 14, 2016, in which he
identified himself as Claudia's husband and said he had found
Barajas' name on Claudia's "friends list."  In the message,

REYES asked Barajas to contact REYES if Barajas heard from
Claudia.

46.  Barajas told the Detectives that she never heard of
Claudia going "clubbing."  According to Barajas, Claudia told
her that REYES would not take her out dancing and that he was a
jealous man.  Claudia did not mention anything to Barajas about
a camping trip for Mother's Day (May 8, the day REYES told
Detectives that he left for a pre-planned camping trip after
dropping off Claudia the night before).  Barajas recalled an
incident that took place about one or two months prior to
Claudia's disappearance.  Barajas stated that during their
separation, Claudia and REYES shared custody of E.  At one
point, REYES had E. for approximately five days, which caused
Claudia to be in a depressed mood.  Claudia told Barajas that
she went to the home of REYES' mother (SUBJECT PREMISES 2) and
stood outside crying because she wanted to see E., but was not
allowed to see him.  For this reason, Barajas found it hard to
believe that Claudia would ever leave E. for any extended
period.

     16.  <u>May 19 interviews with church friend Merari
          Chavez and Pastor Fernando Sowa</u>

47.  On May 19, 2016, SAPD Homicide Detectives L. Rodriguez
and E. Nunez interviewed with Merari Chavez.  Their report
indicates that on the previous day, Chavez had contacted the
SAPD to say that she may have some information involving Claudia
Reyes.  Chavez told the Detectives that she met Claudia at the
Templo De Alavanza Rosa De Saron in Santa Ana, where her parents

are pastors and Claudia was a member of the church choir.
Chavez said that both REYES and Claudia were regular attendees
of the church until they stopped attending late last year
(2015).  Chavez said that REYES recently returned to the church
by himself and she had heard that they were no longer together
because REYES had caught Claudia cheating with another man.

48.  Chavez said that she, REYES, and Claudia communicated
frequently on Facebook.  Chavez said that Claudia had recently
deleted the entire church congregation from her Facebook page
that was under her maiden name, Claudia Sanchez.  On May 5 or 6,
Chavez found a new Facebook page for Claudia under her married
name, Claudia Reyes, with a profile picture of Claudia, REYES,
and E.  Chavez said Claudia's old Facebook account under her
maiden name contained pictures of her and E.  On May 6, 2016,
Chavez sent a friend request to Claudia's new Facebook account,
which was accepted shortly thereafter.  On May 9, 2016, at about
3:00 p.m., unaware of Claudia's disappearance, Chavez had a
Facebook conversation with Claudia Reyes' new Facebook account.
In the conversation, Chavez wrote that she was happy that
Claudia and REYES were working things out and back together.
The response from Claudia's Facebook account was that Claudia
was also happy for the sake of their son.  Chavez had reached
out to Claudia on the same Facebook account since that message,
but never received any reply.  Chavez also called Claudia on her
cell phone, but said the calls went to a voicemail recording
that said the message box was full.

49.  Chavez said that REYES drove a gray Toyota, but she believed he had a new SUV, based on pictures she had seen on Facebook.  REYES told Chavez's parents that he was buying a new car for Claudia because she wanted one.

50.  On May 19, 2016, SAPD Detectives interviewed Fernando Sowa, the pastor of Templo De Alavanza Rosa De Saron in Santa Ana.  The police report states that Sowa told Detectives he met REYES and Claudia about two years ago when they started attending his church.  Sowa said they stopped coming regularly about a year-and-a-half earlier but kept in touch by phone. Sowa stated that REYES had started attending his church again recently.  REYES had told Sowa that Claudia had been unfaithful to him.  Sowa said both REYES and Claudia would call him sometimes and ask him to pray for them.

51.  Sowa told Detectives that REYES had called him around midnight the previous Monday, May 16, 2016, and asked Sowa to come see him.  Sowa and his wife went to the home of REYES' mother (SUBJECT PREMISES 2).  REYES told Sowa and his wife that he needed them to pray for him because he felt sick.  Sowa asked REYES how things were going, making a reference to the marital relationship between Claudia and REYES.  At the time, Sowa and his wife were unaware that REYES had reported Claudia missing. REYES replied, "This is over."  REYES told Sowa he had custody of his son.  Sowa believed that REYES did not elaborate because his mother was present.  Sowa said REYES was nervous and shaking.  Sowa had never seen REYES like that in the two years he had known him.  Sowa said that REYES called him twice the

24

next day, Tuesday, and again on Wednesday, May 18, 2016.  By Wednesday, Sowa had heard the news that Claudia had disappeared and asked REYES about her.  REYES replied, "I don't know."

17.  May 19 drive to LAX parking structure by REYES

52.  On May 19, 2016, the day after REYES was interviewed at his lawyer's office, at approximately 4:19 p.m., members of the OCVGTF followed REYES from SUBJECT PREMISES 2, driving his 2006 Toyota Corolla, to Los Angeles International Airport ("LAX").  Surveillance reports indicate REYES drove around the terminal before parking in Parking Structure 5 ("P5"), which is located near Terminal 2 and is designated for international flights to Central and South America.  REYES parked on level 1G at 6:00 p.m.  REYES got out of his car holding a light-colored backpack in his right hand and closed the driver's side door with his left hand.  Agents lost sight of REYES momentarily and they could not tell if he put the backpack back in the car.  At 6:06 p.m., REYES was walking "aimlessly" around the third floor of the parking structure empty-handed.  At 6:13 p.m., REYES was walking on a ramp towards his car, got in, and drove away.  An extensive search of P5 and the adjacent parking structures at LAX for the backpack was made but it was not found.  REYES drove back to SUBJECT PREMISES 2.

18.  Discovery of Claudia Reyes' blood in Hyundai SUV rented and driven by REYES

53.  On May 20, 2016, Specialist Velarde-Reyes interviewed Claudia Reyes' mother, Rosa Maria Ponce, by telephone.  Velarde-Reyes asked Ponce to forward any photographs she had of Claudia

Reyes in or around an SUV.  In response, Ponce forwarded a
photograph Claudia took of REYES and E. sitting in a 2015 Silver
Hyundai Santa Fe SUV, bearing California license plate number
7KLY760.  A DMV query of the license plate number showed that
the vehicle was registered to MCR Orange LLC, at 130 West
Central Avenue in Santa Ana.

54.  Upon receiving this information, Detective Corporal
Rodriguez went to the address and spoke with Miriam Perez.
According to the police report, Perez was a manager for Budget
Vehicle Rental Corporation.  She said the location on Central
Avenue was a "stop-over" location for vehicles rented at John
Wayne Airport.  Perez checked the inventory for the 2015 Hyundai
Santa Fe, license plate number 7KLY760, and found it was parked
and secured in the lot.  Perez told Detective Rodriguez that,
according to their company records, REYES was the last person to
have rented and used the vehicle.  REYES rented the vehicle on
April 28, 2016, with a scheduled return date of May 10, 2016.
REYES did not return the vehicle until May 14, 2016.  Detective
Rodriguez had the 2015 Hyundai Santa Fe impounded and
transported to the SAPD for forensic analysis.  Perez provided
oral and written consent to search the vehicle on behalf of
Budget.

55.  Once the Hyundai Santa Fe arrived at the SAPD Vehicle
Forensic Analysis Bay, SAPD Forensic Specialist II Magda Perez,
who has worked as a Forensic Specialist for more than thirty
years, conducted a forensic analysis of the vehicle's interior.
I spoke to Specialist Perez who recalled doing a visible search

first using oblique lighting, and then spraying the interior of
the SUV with LCV, which made blood on the rear passenger seat
and near the ceiling light visible.  According to a report dated
September 21, 2016, the blood found near the center ceiling
light matched the assumed DNA profile of Claudia Reyes, obtained
from personal items of hers that had been previously processed.
Two plastic trash bags were found in the cargo area.  One of the
trash bags had holes/tears cut into it, forming an apron-like
pattern.  Based on my training and experience, an apron
fashioned out of a trash bag could be used to keep a person's
clothing clean while committing a violent act likely to result
in blood spatter.

           19.  <u>May 20 surveillance of REYES driving from Orange</u>
<u>to Los Angeles to buy two 11-pound bags of</u>
<u>laundry detergent</u>

    56.  On Friday, May 20, 2016, the day after REYES drove to
the parking structure at LAX, members of the OCVGTF and SAPD
Vice/Narcotic Team conducted surveillance on REYES' residence at
SUBJECT PREMISES 2.  The surveillance reports indicate that at
approximately 6:03 p.m., REYES left in his Corolla.  As he got
on the 22 Freeway, Detectives saw REYES repeatedly checking in
his rear and side view mirrors, a common practice when looking
for surveillance or marked police cars.  REYES was followed to
the parking lot of the Superior Grocers at 5824 South Vermont
Street in Los Angeles, approximately 36 miles from his home.
REYES was followed into the grocery store by Detective Fajardo,
who saw REYES purchase two eleven-pound bags of "Roma" laundry

detergent.  REYES went to a CVS pharmacy in the same parking lot before leaving and driving home.

20.  May 21 interview of W-1

57.  On May 21, 2016, W-1 came to the police station for an interview with Detectives Capacete and Judson.  The police report indicates that W-1 admitted he had been in a sexual relationship with Claudia for the past two months but did not want to say anything because he was married and was in fear of REYES.  W-1 said he thought REYES may be a federal agent who was armed and could have him deported.  As a result, W-1 changed his Facebook profile to show that he had changed his city of residence to Durham, North Carolina.

58.  W-1 said that on May 7, 2016, he was at home in Corona celebrating his son's birthday after 4:00 p.m.  W-1 said that on May 8, 2016, he started the day working at an Amazon store in Buena Park until approximately 5:00 p.m., after which he drove to Garden Grove to work his shift at El Pollo Loco until 12:30 a.m. on May 9.

59.  W-1 also told Detectives that he communicated with Claudia's mother, Rosa Ponce, through the cellphone application WhatsApp.  Rosa told W-1 in a series of text messages about a friend, Carmen Ruiz, who told Rosa in 2014 that REYES had threatened to kill Claudia.  W-1 said Rosa Ponce had forwarded text messages she had exchanged with Claudia's phone through WhatsApp on Mother's Day weekend (Mother's Day fell on May 8 in 2016), following Claudia's disappearance.  Below is the English translation of the text thread:

Message from Claudia's phone to Rosa: *"Mom I can't talk right now I'm working."*

Rosa replied by sending several thumbs up and smiley face emojis.

Rosa texted later, *"Hi daughter have you finished work."*

The next message was sent from Claudia's WhatsApp account: *"Honestly mom it's because I met a White American with blue eyes that will take me to New York and because I don't love eddy and the boy even though eddy loves me very much I'm going with the American. And eddy loves the boy very much I'm leaving him the boy because he will be a better father than me. And we are taking the bus there will not be internet service and I will be disconnecting this phone that way eddy won't follow me I will communicate with you when I arrive. I love you and care for you deeply. Happy Mother's Day."*

Rosa responded with a series of text messages:

*"Daughter answer me please I want to talk and hear your voice"*
*"Hi daughter how are you."*
*"Hi answer me."*
*"Hi."*
*"How difficult it is today on mother's day and I can't call you we are very worried daughter one day god we will know if something bad happened to you."*

60. During their interview, W-1 agreed to take a polygraph test that same evening. Detective Park administered the test and in the pre-examination interview, W-1 denied seeing Claudia

after May 3, 2016.  During his examination W-1 was asked three primary relevant questions: "Did you see Claudia after May 3rd?"; "The last time you saw Claudia, was she dead or dying?"; and "Do you know where Claudia is right now?"  Afterwards, Detective Park analyzed the charts produced during the polygraph examination and concluded that W-1 showed no significant signs of deception when he answered "No" to the three questions.

### 21.  May 23 search of defendant's trash

61.  On May 23, 2016, at about 2:10 a.m., Detectives Garcia, Rojo, and Castorena picked up the trash that had been left in front of SUBJECT PREMISES 2.  Det. Castorena found an empty eleven-pound bag of "Roma" laundry detergent, which was the same size and brand as the two bags REYES bought at the Superior Grocers in Los Angeles two days earlier.

### 22.  May 23 search of Hyundai SUV by cadaver dog

62.  On May 23, 2016, Detective J. Capacete and members of the Orange County Sheriff Department's ("OCSD") Search and Rescue Division requested a cadaver dog to search the 2015 Silver Hyundai Santa Fe that had been rented by REYES.  Per the police report, OCSD Reserve Sergeant Alan Lenning brought his Human Remains Detection K9, Abby, to perform the search of the vehicle.[2]  During this search, Abby alerted to the back seat and rear passenger compartment of the vehicle, which indicated that at one time a dead human body was in those areas of the vehicle.

_____

[2] Abby was certified yearly through California's Office of Emergency Services.  Abby has conducted approximately 30 cadaver-related searches and made four positive finds.  In those four instances, law enforcement then dug up the area and found either bloody clothing, bones, or a body.

**C.    REYES Sets Up Robbery of Claudia's Cell Phone**

63.  On May 25, 2016, I obtained a search warrant for REYES' bank records from JP Morgan Chase.  The records showed a $300 ATM withdrawal on April 12, 2016, from the Chase Bank located at 12851 Harbor Boulevard in Garden Grove.  This branch is in the same shopping center as the El Pollo Loco where Claudia worked.  A Garden Grove Police report showed that on the same day, April 12, 2016, approximately 25 days prior to her disappearance, Claudia was robbed of her cell phone in the area of Buaro Street and Harbor Boulevard, approximately a third of a mile from the Chase Bank branch.  The robbery occurred about 5:23 p.m.  The ATM withdrawal from REYES' account occurred at 4:23 p.m.

64.  A review of the GPS coordinates for REYES' cell phone number (714-225-7207) showed that at the time of the robbery REYES was in the area of a Denny's restaurant at 13302 Harbor Boulevard in Garden Grove.  This location is less than a half mile from the site of the robbery at Harbor Boulevard and Buaro Street.  In August 2016, SAPD Detective Becerra called the Denny's restaurant and was told their surveillance video was kept for only 30 days and they would not have any archived video from April 2016.

65.  A review of the REYES' call detail records for April 12, 2016 showed a total of fourteen phone contacts with 714-770-3338 between 4:36 p.m. and 5:41 p.m.  The calls varied in duration from a few seconds to a couple minutes in length. There were no calls made to or received from 714-770-3338 on any

date other than April 12, 2016.  A records check for 714-770-
3338 showed the number was registered under the name Rosa
Reynoso at Cortez Painting, LLC, in Fullerton.

66.  On September 14, 2016, a search warrant was obtained
for records pertaining to 714-770-3338.  The subscriber
information listed two individuals, Rosa Reynoso and A.V.  The
address listed for Rosa Reynoso was in Colorado, while the
address listed for A.V. was 1549 South Dallas Drive in Anaheim,
California.

67.  On December 1, 2016, SA Shea, TFO Becerra, and I drove
to 1549 South Dallas Drive in Anaheim to interview A.V.  As we
approached the residence, we contacted Omar Augustin Herrera.
Herrera told us he lived at 1549 South Dallas Drive, but that
A.V. moved out a few months ago.  Herrera claimed he did not
know where A.V. was currently living or his current phone
number.  Herrera said A.V.'s father, Carlos V., lived at 1549
South Dallas Drive, and dated Omar's mother.  SA Shea asked
Herrera to give Carlos V. his FBI business card.  A few hours
later, Carlos V. called SA Shea and said his son A.V. was living
in Laguna Hills but did not have a phone.  Carlos V. told SA
Shea that he would attempt to arrange a time and place to meet
with A.V. the following day.

68.  On or about December 2, 2016, SA Shea and I
interviewed A.V., who was accompanied by his father, at The
Pizza Store on Alicia Parkway in Laguna Hills.  A.V. confirmed
that he previously had a cell phone with the number 714-770-3338
(the number that was in contact with REYES on April 12, 2016).

69.   SA Shea showed A.V. a series of photographs to see if
he recognized any of the individuals.   SA Shea first showed A.V.
a picture of Claudia, followed by DMV photos of REYES and Pablo
Orellana.   A.V. initially said he did not recognize any of them.
I then showed A.V. a more current photo of both REYES and
Claudia taken from Facebook.   A.V. again denied knowing anyone
in the photographs.   SA Shea then told A.V. that his phone had
been in contact with the pictured individual identified as
REYES.   SA Shea told A.V. that he and REYES contacted each other
about fourteen times by phone on April 12, 2016.   Shea said the
calls coincided with the theft of a cell phone that took place
at that time.   SA Shea then asked, "Does that ring a bell?"
A.V. replied, "Yeah, I don't know where he's at though."

70.   A.V. continued, "He said the phone was stolen from him
and he said he wanted it back, and, um, I was kind of in need of
money."   While pointing to a picture of REYES, SA Shea asked
A.V. if the "he" that A.V. was referring to was the person in
the picture.   A.V. answered, "Yes."   SA Shea asked A.V. if he
now also recognized the picture of Claudia that he was shown
earlier.   A.V. again denied remembering Claudia; however, later
in the interview, A.V. confirmed that he had recognized her.   I
then asked A.V. if he had recognized REYES the first time we
showed him the photo.   A.V. said that he did.

71.   A.V. then provided the details of what occurred on
April 12, 2016.   A.V. said he was "working advertisement that
day."   At the time, A.V. worked for a shoe store and was paid to
stand on the sidewalk near the corner of Garden Grove Boulevard

and Harbor Boulevard, and display a sign advertising the
business, "Deck N Shoes." According to A.V., REYES approached
him and said, "Hi, I wanted to ask you a question, how much do
you make here?" A.V. told REYES that he did not make much and
was "struggling." A.V. said that REYES then presented him with
an opportunity: "He's like, well, if you want, you can make a
little money if you help me out." A.V. agreed and asked REYES
what the job entailed. REYES replied, "Well, I need you to take
a phone from this girl." A.V. said that REYES showed him a
picture of the girl on his cell phone and sent the picture to
A.V.'s phone. A.V. admitted he recognized the picture of
Claudia as the victim he stole the phone from on April 12, 2016.
A.V. said he recognized her because of the noticeable mole on
her face.

72. REYES told A.V. that the girl worked at the El Pollo
Loco in the shopping center next to where A.V. was holding the
sign. We asked A.V. if REYES told him what time the girl was
supposed to get off work. A.V. replied, "I think it was around
5ish." A.V. said, "He told me that she was going to get off,
wait at the bus stop." REYES said the girl would be wearing an
El Pollo Loco uniform and would wait at the bus stop located
directly in front of the El Pollo Loco. REYES said the bus
Claudia took would arrive around 5:00 p.m. REYES described the
phone that he wanted A.V. to take: "he said that it had a case
on it and had a certain wallpaper of these, like, the family on
there so that's how I knew it'd be the same phone."

73.  A.V. said he went to the bus stop ahead of time and waited for the girl to arrive.  Eventually, the girl joined him at the bus stop where the two were alone.  A.V. then described his interaction with Claudia: "I just asked her what time it was on her phone so she would take it out, she took it out and then like, oh, thank you and then I waited and she just had her phone out the whole time, I grabbed it and started running."  A.V. said there was no resistance or struggle from Claudia as he took the phone and started running.

74.  After the robbery, A.V. said he went to a rear alley behind the Deck N Shoes where he worked.  A.V. called REYES and said he was "done."  REYES told A.V. to "meet me at Yoshinoya." A.V. said he grabbed his skateboard he kept at work and went to the Yoshinoya, which was located near the 22 Freeway.  As noted above, GPS data showed REYES' phone pinging off a tower near the Denny's Restaurant located at 13302 Harbor Boulevard around the time of the robbery.  The tower is approximately 250-300 yards from the Yoshinoya.

75.  When he arrived at the Yoshinoya, A.V. said he got into a gray Japanese car driven by REYES.  A.V. said he handed REYES the phone and "he just gave me the money and dropped me off."  A.V. confirmed he was given $300 in cash, which was the amount withdrawn from REYES' account at the nearby Chase ATM about an hour earlier.  A.V. said REYES drove him north on Harbor Boulevard and dropped him off a short distance north of the location of the robbery.  A.V. said he did not see Claudia or any police when they drove back northbound on Harbor.  SA

Shea and I showed A.V. a picture of REYES' gray Toyota Corolla. A.V. said the car in the picture resembled REYES' vehicle, and it "could have been the car."

76.   When asked if he had seen REYES since the robbery, A.V. said that about a month after the robbery, REYES found him outside of Deck N Shoes.  A.V. said: "Um, there's another time he came in and he wanted me to plant cocaine on her [Claudia]. And I told him no, I didn't want to do that."  A.V. said REYES asked A.V. if he knew where to find cocaine and that he would pay him again if he helped him with this second request.  A.V. said that he had not seen or spoken to REYES since then.

### D.   May 26 trip to Palmdale by REYES and Pablo Orellana

77.   On the evening of May 26, 2016, REYES was followed by members of the OCVGTF to Harbor-UCLA Medical Center in Torrance, where he walked inside.  According to surveillance reports, shortly thereafter, REYES left the hospital and got back into his Corolla with a male passenger in the right front seat. Surveillance personnel followed REYES to an apartment complex at 8000 South Broadway Street in Los Angeles, where REYES was seen walking into the complex.  As REYES entered the building, the unidentified male passenger got out of the car and sat in the driver's seat of REYES' Corolla.  A few moments later, REYES left the apartment building and sat in the right front passenger seat of the Corolla.  The car was followed to the Tacos Gavilan at 4380 South Broadway Street in Los Angeles.  REYES and the unknown male walked into the restaurant.

78.   While REYES and the unidentified male were eating,
officers contacted the LAPD Traffic Division and asked them to
conduct a vehicle stop on REYES to identify his male passenger.
Approximately forty-five minutes after entering the restaurant,
REYES and the unidentified male left the restaurant and got into
REYES' car.  Shortly after leaving the restaurant parking lot,
the car, with Orellana driving, was pulled over by LAPD Officer
Kors for having items hanging from the rear-view mirror, a
violation of the California Vehicle Code.  The male companion
was identified by his California driver's license as Pablo
Israel Orellana, REYES' half-brother, with a listed address of
8000 South Broadway, Apartment 404, in Los Angeles.  Pablo
Orellana was issued an LAPD Traffic Violation warning and
released.

79.   Following the traffic stop, REYES and Pablo Orellana
were followed to 36209 East 42nd Street in Palmdale.  At this
time the surveillance was concluded.  A database check of this
address in Palmdale showed it to be the registered address of
Wilfredo Cruz.

80.   On May 27, 2016, OCVGTF TFO G. Zuniga sent a facsimile
request to the Harbor-UCLA Medical Center requesting Pablo
Orellana's admission paperwork.  The paperwork showed Orellana's
address as 8000 South Broadway Street, Apartment 404, in Los
Angeles and 213-436-9062 as his cell phone number.  Orellana
listed Wilfredo Cruz as a sibling.

81.   On June 8, 2016, at about 11:00 a.m., SAPD Crime Scene
Investigator J. Carlson took 82 aerial photos of the residence

of Wilfredo Cruz and the surrounding area at 36209 East 42nd
Street in Palmdale.  FBI analysts could then examine the
pictures closely to see if there had been any unsettled or
recently excavated plots on the property.  However, due to the
foliage and structures present on the property, the search for
any such disturbances was inconclusive.

**E.   Cell Site Data Showing the Movement of Cell Phones
      Belonging to REYES and Claudia from May 6 through May
      8, 2016**

82.  During the May 21, 2016, interview with Claudia's
Supervisor, Maria Ayala, Ayala provided SAPD Detectives with a
copy of Claudia's timesheet, which showed that Claudia clocked
out of work on May 6, 2016, at 8:03 p.m.  As noted above, one of
Claudia's coworkers said she was picked up by REYES that night.
A review of REYES' call detail records by Lorie Velarde, a
Geographic Information Systems Analyst with the Irvine Police
Department, confirmed that REYES' phone was near the El Pollo
Loco at 8:04 p.m. on the night of May 6, 2016.

83.  Shortly after being picked up from work, Claudia's
phone records showed a lack of random data activity, which is
consistent with a phone that is not being used.  Call detail
records showed that Claudia's phone was in the area of Maria
Orellana's home (SUBJECT PREMISES 2) at about 8:31 p.m., where
it remained until the following afternoon.

84.  On May 7, 2016, at about 12:02 a.m., records show that
Claudia's phone was likely turned off until about 7:14 a.m. the
same day.  During this time, data transmissions for REYES' phone
also placed him near SUBJECT PREMISES 2.  REYES' phone also

shows a lack of random data activity from May 6, 2016, at 8:11 p.m. until the following day at 2:47 p.m.

85.  On May 7, 2016, at approximately 3:05 p.m., two text messages were sent from Claudia's phone to her coworker, Eunice Ayala's phone number, 714-818-xxxx.  Based on an interview with Claudia's supervisor, Claudia was scheduled to work on May 7 from 3:00 p.m. until 11:00 p.m.  As noted above, during her interview with SAPD Detectives on May 17, 2016, Eunice Ayala showed the Detectives two text messages she had received from Claudia that Ayala thought were suspicious.  The two texts in Spanish stated, "Eu[nice] please tell the boss that I can't come to work these days because I'm feeling really sick.  When I get back, I'm going to give a note from the doctor."

86.  A few minutes later, at 3:17 p.m., a series of texts were sent from Claudia's phone to 714-862-xxxx, the phone number for Olga Esquivel, who was the paralegal from Daniel S. March and Associates, the firm assisting Claudia with her divorce and restraining order.  As described above, during her interview Esquivel remembered that the messages said that Claudia did not love her son or husband anymore and was leaving for New York with a man she had met.

87.  The next movement of Claudia's phone from SUBJECT PREMISES 2 was on May 7, 2016, at approximately 3:05 p.m., when both REYES' and Claudia's phones went to the area of 2015 North Bush Street.  Claudia's phone remained there, while REYES' phone returned to the area of SUBJECT PREMISES 2 at about 4:13 p.m. The last activity on Claudia's phone with location data showed

39

the phone was still in the area 2015 North Bush Street at 11:03
p.m. the night of May 7.  At 11:13 p.m., REYES' phone was shown
in the area of 2015 North Bush Street, where it remained until
the following morning at 5:42 a.m.

88.  As noted above, during his interview with SAPD
Detectives on May 18, 2016, REYES said that on May 7, 2016, at
about 10:45 p.m., he dropped Claudia off at the McDonalds in the
area of 17th Street and Lincoln Avenue in Santa Ana, so she
could go out dancing with her girlfriends.  The call detail
records showed neither REYES' phone nor Claudia's phone were in
the area of 17th Street and Lincoln Avenue on the night of May
7, 2016.  During the same interview, REYES claimed that he
called her while he and his family were on their trip near the
Salton Sea.  A review of REYES' call detail records revealed
that his last contact with either of Claudia's phones was on May
6, 2016.  (It appears that Claudia obtained a phone with her old
phone number after her phone was stolen at REYES' direction, and
that REYES bought Claudia a new phone.)

89.  On May 8, 2016, at about 7:02 a.m., REYES' phone
traveled to two locations in Santa Ana before going to the area
of SUBJECT PREMISES 2.  At 8:32 a.m., REYES' phone began to
travel to Salton Sea from the area of SUBJECT PREMISES 2.  After
making a stop in the area of Cabazon, REYES continued towards
the Salton Sea, where he arrived at approximately 1:56 p.m.

90.  Video surveillance footage obtained from the apartment
complex at 2015 North Bush was reviewed by members of the
OCVGTF.  During a review of the surveillance video from Camera

6, Claudia and E. were seen leaving through the west door of the apartment complex on May 6, 2016, at approximately 11:44 a.m. This footage corresponds with W-1's statement to Detectives that he listened in by phone to an argument between REYES and Claudia on May 6, 2016, concerning a baby sitter for E. that day.  W-1 was speaking to Claudia via her old telephone number when she received a call on her new phone from REYES, and put the call from REYES on speaker so W-1 could hear it.  W-1 told the Detectives that Claudia told REYES she did not want to take E. to the home of REYES' mother, and REYES tried to persuade Claudia to go out with him that night.  Based on a conversation that took place earlier the same day between Claudia and Adriana Arzate, it appears on video that Claudia was taking E. to SUBJECT PREMISES 2 after Adriana said she could not watch him that day.

91.  As noted above, on May 7, 2016, at about 3:05 p.m., data from Claudia's cell phone showed her phone to be in the area of the Bush Street apartment.  However, Claudia is never seen again on any of the apartment's surveillance videos after she left the complex with her son on May 6, 2016.

92.  Per SAPD records, on May 10, 2016, at about 11:22 a.m., a person identifying themselves as "Tomas," and a co-worker of Claudia's at El Pollo Loco, called SAPD.  The caller was concerned for Claudia because she had not come to work for the past four days.  "Tomas" requested a welfare check on Claudia at her apartment on Bush Street.  On May 10, 2016, at approximately 12:10 p.m., two uniformed SAPD Officers are seen

on surveillance video entering the complex through the west door and walking up the stairs.  The responding officers said there was no answer at the door.  The officers spoke to the apartment manager, who said he had not seen Claudia since Friday.

93.  On May 10, 2016, at approximately 6:00 p.m., REYES' Toyota Corolla is seen returning to 2015 North Bush Street and parking in his assigned spot.  Two males believed to be REYES and Pablo Orellana are seen unloading a few flattened cardboard boxes and walking to the elevator.  At about 7:23 p.m., both subjects exit the elevator on the west side of the complex.  The male believed to be Pablo Orellana is seen carrying a large black trash bag towards REYES' Toyota.  After Orellana exited the elevator, REYES dragged a cardboard box from the elevator to the Toyota Corolla, where they appeared to load the vehicle. The person believed to be Pablo Orellana then walked in the direction of the dumpsters possibly carrying a bag of trash, which was no longer in hand when he walked back to REYES' car. The Toyota Corolla left the apartment parking garage at approximately 7:28 p.m.

**F.   REYES and Claudia Were Scheduled to Move to a New Apartment on May 8, 2016**

94.  On May 17, 2016, Investigative Specialist Velarde-Reyes spoke with Maria Martinez, the manager of Rancho Vista Apartment Homes in Anaheim.  Per the police report, Martinez said that on May 5, 2016, REYES and Claudia came in and filled out applications to rent an apartment.  Their move-in date was scheduled for May 8, 2016.  Martinez sent Velarde-Reyes copies

of the applications.  Martinez said that on May 10, 2016, she called REYES to see if he was still interested in the apartment. Martinez said that REYES told her he was probably getting divorced and was no longer interested in the apartment.

**G.   GPS Coordinates Show Claudia's Cell Phone Not Active on May 18**

95.  On May 18, 2016, at approximately 4:00 p.m., SAPD Detective J. Garcia submitted an emergency request to Sprint, which resulted in real time GPS coordinates being initiated at approximately 10:30 p.m. for both phone numbers used by Claudia (714-420-8514 and 714-348-7152).  All coordinates sent from Sprint's Electronic Surveillance Unit showed "(0.00)," meaning the phones were either turned off or did not have sufficient battery power.

96.  The call detail records show the last outgoing voice call from Claudia's phone was on May 6, 2016, at 5:41 p.m. Outgoing texts stopped on May 7, 2016, at 3:17 p.m.  Based on the records, "routed calls" were rare for Claudia's phone before May 7, 2016, with approximately ten prior to that date.  "Routed calls" are typically calls that go direct to voicemail.  After May 7, 2016, the records show more than 200 routed calls.  Every text message and routed voice call after May 7, 2016 at 5:17 p.m. is incoming.

### H.   Interview of USCBP Employees

#### 1.   REYES hired a USCBP coworker to follow Claudia

97.   On May 21, 2016, Detectives Jim Garcia and Frank Gomez interviewed USCBP employee Alex Cruz.[3]  Per the police report, Cruz said he was a coworker of REYES.  Cruz said he also owned a private investigation business.  Cruz said he met REYES through a mutual friend at CBP – all three worked at the CBP office in Long Beach – whom REYES had approached about doing surveillance on his wife.  On April 8, 2016 – one month before the disappearance of Claudia – REYES met with Cruz and told him that he suspected his wife of cheating and asked Cruz to follow her to get evidence.  REYES gave Cruz Claudia's work schedule at El Pollo Loco and the schedule of the buses she took to get to work.  On one occasion, Cruz was outside the El Pollo Loco where Claudia worked when REYES called him and asked if Claudia was flirting with anyone.  When Cruz said there was no sign of flirting, REYES questioned whether Cruz was even at the El Pollo Loco.  Cruz sent REYES a photo to confirm he was outside the restaurant.  REYES then asked if Cruz was flirting with Claudia.

---

[3] Alex Cruz was terminated by USCBP on May 21, 2019, for inappropriate association with an aggravated felon, lack of candor, unauthorized outside employment and other issues.  With respect to the reliability of the statements Cruz made during his first interview, he showed the interviewing detective a few of the texts from REYES.  The Detective said the texts he read corroborated what Cruz said during the interview related herein. In a recent interview, discussed below, Cruz sent copies of text messages from REYES that corroborate his statements.  Some of those messages are set out below.

98.   Later, REYES asked Cruz to install cameras in
Claudia's apartment, which Cruz declined to do.   REYES asked
Cruz to take Claudia's phone by force, but again Cruz refused
and told REYES that would be robbery.

99.   According to Cruz, REYES told him that Claudia had a
"conventional green card" that was expired.   Cruz told REYES
that he could not work for the USCBP if his wife was in the
country illegally and recommended that REYES notify his
supervisor.   REYES told Cruz that he had already told his
supervisor and would reconcile with Claudia if she renewed her
alien status.

100. Cruz eventually discovered temporary restraining
orders ("TROs") (discussed below) against REYES and confronted
him with them.   He told REYES he would not have taken the job
had he known of the TROs.

101. On March 5, 2021, FBI SA Altamirano and I interviewed
Cruz by telephone.   Cruz provided additional information and
copies of text messages he had received from REYES.   Cruz said
that when he first spoke with REYES, REYES provided him with a
description and photographs of Claudia, her work schedule, and
other information to help Cruz establish a pattern of life for
Claudia.   Cruz told us that REYES also told him about certain
areas where Claudia was known to travel that were dark and
secluded.   Cruz said he found the information odd because it was
not needed to determine if Claudia was having an affair, and
seemed more like information that would be given to a "hit man."
REYES told Cruz that Claudia was "observant," and had caught

REYES in a rented car following her on one occasion.  REYES also gave Cruz photographs and vehicle information for the man he believed was having an affair with Claudia, whom he identified as Ariel Zaa.  REYES wanted Cruz to place a tracking device on Zaa's car and surveillance cameras in the Bush Street apartment.

102. Cruz told us he conducted surveillance of Claudia at work but saw no sign of an affair.  At one point, REYES called Cruz and told him that Claudia was aware that he was following her.  Cruz told REYES that was not possible and asked REYES if he had hired someone else to follow Claudia.  REYES admitted he had hired someone else.  Cruz told REYES he should not have done so because Cruz believed that would constitute harassment or stalking.

103. Following the interview, Cruz sent us copies of text messages he had received from REYES that he had downloaded and saved on his computer.  Among the texts were the following:

- "I don't want to sound desperate but I kind of am since this woman wants to ruin my life and career.  I really need your help on this one, sir."

- "Will you be able to retrieve for me what I asked[?]"

- "I need to know if you can go because we are running out of time.  I will pay you bus fare if you take bus with her."

- "Worst case scenario I need to get that phone from her without her knowing when you ride the bus with her.  It has a lot of my personal data there."

46

I called Cruz back and asked him what REYES was talking about in
these texts.  Cruz told me that REYES had asked him to steal
Claudia's phone.  Cruz told me that he asked REYES why he wanted
Cruz to steal Claudia's phone.  REYES told Cruz that Claudia had
incriminating evidence on her phone that could ruin his career.
I read another text from REYES to Cruz that stated as follows:

- "Officer Cruz thanks for the offer but please cancel what
  we spoke about at work.  Everything's fine now.  Thanks."

The text was dated April 22, 2016.  As noted above, on April 12,
2016, REYES had Claudia's phone stolen while she waited at a bus
stop.

104. In his first interview, Cruz said that he confronted
REYES when Cruz learned of the TROs against REYES.  In this
interview, Cruz told us that he told REYES he was violating the
terms of the restraining orders by having Cruz conduct
surveillance on Claudia.  Cruz provided the following text from
REYES concerning the TROs:

- "It is a temporary restraining order based on false
  allegations.  She's placed it so that she may continue
  her infidelity.  It will be lifted on the 18th.  This
  woman is just trying to ruin everything I worked for.
  Like I mentioned before she's doing all this to stay in
  the country since her conditional visa expired."

With respect to Claudia's expired visa, Cruz told us that REYES
had asked Cruz if he could help get Claudia deported.  Cruz told
REYES he could not do that, that there was a process for that,

and that Claudia had rights she could exercise in any deportation proceedings.

2.   Interviews with Café 301 Employee K.R.

105. On June 9, 2016, SAPD Detective Corporal C. Elms received an email from the Department of Homeland Security ("DHS") Assistant Special Agent in Charge ("ASAC") Thomas Skinner.  In the email, ASAC Skinner wrote that he had received a call from USCBP Officer Monique Burton, who told him a female employee working at the 301 Café had confided in her that REYES had been asking her to go out for approximately three weeks. ASAC Skinner provided the address to 301 Café (301 East Ocean Boulevard in Long Beach) and said it was connected to the building that housed the USCBP Long Beach Office.  On or about July 8, 2016, I called Officer Burton and learned the name of the café employee was K.R.

106. On July 8, 2016, at about 11:45 a.m., Deputy V. Valdez and I walked into Café 301 and asked the manager if we could speak to K.R.  When K.R. walked out from behind the counter, we asked if we could speak to her outside.  K.R. agreed and accompanied us to the lobby area of Westin Hotel, located next door.  During the interview, K.R. said that she began working at Café 301 in the beginning of April 2016.  K.R. met REYES when he came into the café to get something to drink or eat.  During their first conversation, K.R. told REYES that she was from Guatemala, which seemed to pique his interest.  K.R. remembered REYES stating, "Oh yeah, I know a lot of Guatemalans."  REYES told K.R. that he was from El Salvador.  After their first

encounter, K.R. noticed that REYES would come into the café more frequently and began ordering food and drink items that took more time to prepare, which gave him more time to talk to K.R. K.R. said she felt uncomfortable around REYES when he would make comments or ask questions about her personal life.  K.R. recounted one such comment when REYES asked her, "Oh, how come you don't cook for me."  K.R. had made it clear to REYES on more than one occasion that she had a boyfriend she lived with. REYES would sometimes ask about K.R.'s relationship with her boyfriend, ostensibly to see if her status had changed.

107. In one of numerous conversations, REYES told K.R. that he lived alone in a "pretty big place," which had its own gym area.  REYES said that he was paid well and that his job helped him complete his bachelor's degree from the University of California, Irvine.  When K.R. asked him if he was dating, REYES replied, "No, the person I like is taken," appearing to make a subtle reference to K.R.  REYES also told K.R. he valued honesty and did not like when people lied to him.

108. Shortly after Mother's Day, May 8, 2016, K.R. was on a break and sitting outside the café in an adjacent courtyard. REYES walked over to K.R.'s location and sat down with her. K.R. recalled asking REYES how he spent his Mother's Day. Around the same time period, K.R. recalled asking REYES if he was "seeing," or dating, anybody.  K.R. remembered REYES telling her, "I'm not ready for that.  I'm not ready for kids, for a marriage . . . nothing."  It was at this time that K.R. noticed the wedding band on the ring finger of REYES' left hand, which

K.R. said REYES usually kept in his pocket when he would come
into the café.

109. About two or three weeks after Mother's Day, REYES
found K.R. eating in the courtyard again when he approached her
and began talking.  During their conversation, REYES mentioned a
job opportunity in New Jersey to K.R.  REYES wanted K.R. to
accompany him to New Jersey for a weekend so she could do some
voice work in Spanish for a radio station that supposedly needed
a woman with a "Guatemalan accent."  REYES told K.R. the unnamed
radio station would pay her $1,000 plus her expenses for the
job.

### 3.   Interviews with other USCBP employees

110. In early June 2017, I received a phone call from
Officer Burton.  Officer Burton recommended we interview some of
REYES' coworkers at the USCBP office in Long Beach.  According
to Officer Burton, REYES had made comments to these coworkers
regarding Claudia that were peculiar or suspicious in nature.
Officer Burton gave me names and contact information for the
coworkers.  On or about June 13, 2017, SA David Shea and I
conducted interviews with several of REYES' current and former
coworkers.

111. SA Shea and I then interviewed USCBP employee Bryan
London, who also worked with REYES for a period.  London
recounted that REYES would occasionally discuss issues that he
was having with his wife, Claudia.  London recalled that on one
occasion REYES called him late one evening and asked if he could
borrow London's truck.  According to London, REYES told him that

he wanted to follow his wife, whom he suspected of having an affair.  London refused to allow REYES to borrow his truck, but said he thought it was suspicious behavior by Reyes.

112. During the interview of USCBP employee Leticia Carranza, she told us that when she worked with REYES she witnessed outbursts of anger when he spoke on the phone with his wife, Claudia.  At one point during his marriage with Claudia, Leticia said that REYES approached her and asked if her 26-year-old son would be interested in receiving money in return for beating up the man he suspected was having an affair with Claudia.  Leticia believed that REYES asked that because her son had previous involvement with a gang.  Leticia refused the offer and found the question to be strange.

113. We then interviewed USCBP employee Maria Rodriguez, who worked in the same section as REYES.  When they first started working together, Maria had learned from REYES that he lived for his wife, Claudia, and wanted to have the home life that he missed out on as a child.  However, over time, REYES told Maria that he and Claudia were having problems and that he wanted to get her pregnant to prevent her from leaving him.  It appeared to Maria that REYES was obsessed with Claudia.  Maria told us that she and REYES had a good working relationship until the point he asked her to "friend," or gain access to, Claudia's personal Facebook account.

114. Maria told us that after Claudia's disappearance, REYES came into work complaining of back pain.  REYES explained that his back was hurting because he helped a "friend move in

the middle of the night." REYES provided different explanations for Claudia's disappearance, including that she had left with either a UPS or FedEx employee, and left their son behind. Maria also said that REYES exhibited traits of having a bad temper. Maria explained that if things did not go in his favor, REYES would either get angry or seem disinterested. Maria said she could not work with REYES because she was afraid of him due to his emotional instability.

     **I.    REYES' History of Domestic Violence and Abuse**

          1.   <u>REYES' threats to kill Claudia; other evidence of abuse</u>

115. I read a report of an interview of Carmen Ruiz, conducted on May 24, 2016. Ruiz met Claudia in the summer of 2014, when Claudia worked for Ruiz's sister at a Carl's Jr. restaurant at John Wayne Airport. In August 2014, Claudia showed up at Ruiz's home with her son. Claudia said REYES had assaulted her, and later sexually assaulted her. Claudia had told Ruiz that she believed REYES raped her because she no longer wanted to be with him. Ruiz recalled that Claudia had bruises on her legs and arms, and a cut lip. According to Ruiz, Claudia was very afraid of REYES and told Ruiz that REYES had told Claudia that he would kill her and discard her in the trash or the ocean. Ruiz said that Claudia stayed with her for 10-14 days. Ruiz said she stopped seeing Claudia after she reunited with REYES.

116. As noted above, Eunice Ayala, Claudia's co-worker, was interviewed on May 17, 2016. Per her interview report, Eunice

became friendly with Claudia when she started working at El
Pollo Loco because they both were from El Salvador.  Claudia
told Eunice that REYES threatened Claudia that if she did not
get back together with him, she would not be with anyone.  REYES
told her he would rather see her dead than make a life with
another man.  Eunice said this occurred about three weeks before
Claudia and REYES started living together again (which appears
to have happened in late April 2016).  Claudia told Eunice that
she had recorded the fights with REYES on her cell phone and
that she had a lot of evidence of the abuse, but her phone had
been stolen – an apparent reference to the incident described
above, when REYES offered and gave A.V. $300 to steal Claudia's
phone.  Claudia told Eunice that she and REYES argued about E.
going to the house of REYES' mother.  When Eunice last saw
Claudia on May 6, Claudia looked "angustiada," distressed deep
down, even though she said she was fine.  Eunice said Claudia
had stopped talking to her about her problems with REYES because
Eunice scolded Claudia for not taking advice about REYES.
Eunice said in the past that Claudia had shown Eunice bruises on
her arms from REYES.

117. During SAPD Detectives' interview of Claudia's
supervisor, Maria Elena Ayala, on May 17, 2016, Maria said
Claudia began working at the El Pollo Loco in an effort to
become more independent.  Per the police report, Claudia told
Maria that REYES was abusive and did not treat her well.  Maria
recalled a period when the couple separated, and Claudia hired
an attorney to gain custody of their son.  Maria Elana recalled

that approximately one month before Claudia's disappearance,
REYES and E. showed up to the El Pollo Loco looking for Claudia.
Maria called Claudia to tell her that REYES and E. were at the
restaurant.  Claudia told Maria that she was on her way and to
ask REYES not to leave.  While waiting for Claudia, REYES
approached Maria and asked if she could convince Claudia to
reconcile with him.  Maria refused.

118. Maricela Mendoza, a neighbor of Claudia's at the Bush
Street apartments, was interviewed on May 23, 2016.  According
to the police report, Mendoza said REYES came to her door one
day crying and asked if she had seen Claudia.  REYES said he did
not know if Claudia had been kidnapped and was worried because
she had a mental condition.  Several days later Mendoza saw
Claudia and spoke with her.  She said Claudia laughed and said
she had no mental condition.  Mendoza became friends with
Claudia.  At one point, Claudia sent Mendoza pictures of bruises
Claudia had, and asked Mendoza to save them in case REYES got
her phone.  Mendoza said there were times when Claudia and her
son had no food, and Mendoza would take food to them (as did
Alejandra Gallegos, mentioned above).  Claudia told Mendoza that
REYES had bought her a new car and phone and was going to put
the car in her name.  Mendoza said she last spoke to Claudia on
May 6, 2016, when Claudia asked if Mendoza could babysit for
her.  Mendoza said Claudia was overprotective of her son and
would never leave him.

119. Melissa Reyes is married to REYES' brother, Roy Reyes.
I read a report of an interview conducted with her on June 2,

2016.  Melissa Reyes said REYES recently told her that Claudia had recorded him on her phone admitting he abused her.  REYES swore to her that he never physically abused Claudia, but was upset that the recording might prevent him from getting custody of his son.  REYES told Melissa that a coworker had suggested stealing the phone.  Melissa Reyes said her husband Roy was estranged from his half-brother, Pablo Orellana, whom he described as bad news.  Melissa Reyes said that REYES began speaking with Pablo Orellana a few months before Claudia's disappearance.  Melissa said she did not believe Claudia would ever abandon her son.

> ### 2.   August 28, 2014, Temporary Restraining Order against REYES

120. On August 28, 2014, Claudia obtained a TRO against REYES from the Lamoreaux Justice Center in Orange County based, in part, on allegations of domestic violence.  The TRO required REYES to move out of their Bush Street apartment and maintain a distance of 100 yards or greater from Claudia and E.  REYES was also restricted from contacting Claudia by phone, mail, or email.  REYES was served at the Lamoreaux Justice Center the same day the TRO issued.  The TRO was scheduled to expire at the conclusion of a hearing scheduled on September 18, 2014.  On September 18, 2014, Claudia filed a Request for Dismissal of the TRO.

121. In the background questionnaire verified by REYES for his job at USCBP in June 2015 that I reviewed, REYES was asked if had been a "party to any public record civil court action" in

the last ten years.  REYES answered no, despite being subject to
the TRO filed in Orange County the prior year.

      3.   February 28, 2016

122. According to a police report I read, on February 28,
2016, at about 10:41 p.m., Claudia called the SAPD and said she
had an argument with her husband over her legal status.  Claudia
told the dispatchers that her husband had a history of abusing
her and domestic violence.  REYES had left the residence when
Claudia called the police.

      4.   February 29, 2016

123. On February 29, 2016, at approximately 12:39 p.m.,
Claudia called the SAPD and told dispatchers that she was
arguing with her husband, REYES, and he was not allowing her to
leave even though she had to go to work.  According to the
police report, officers arrived and determined that the couple
were engaged in an argument after REYES had served Claudia with
divorce papers.

      5.   March 4, 2016

124. On March 4, 2016, at about 7:03 a.m., Claudia called
the SAPD and told dispatchers that REYES was outside their
apartment on Bush Street.  Claudia said that REYES had taken
their son on February 29, 2016, and had refused to return him.
Claudia said she placed a chair against the door so REYES would
not enter the apartment since he had a key to the apartment.
Claudia told dispatchers that REYES entered their apartment the
day before and took her social security card and personal
documents.  During this call for service on March 4, Claudia

56

said that on February 29, 2016, REYES had threatened to kill
Claudia and their son.  Claudia said she did not mention this to
officers on February 29 out of fear.

125. At 7:15 a.m., that same day, twelve minutes after the
call from Claudia, the SAPD received a call from REYES in which
he told dispatchers that he was at the apartment and Claudia was
refusing to allow him to see his son.  Upon their arrival,
officers concluded that the incident was not a domestic violence
investigation, but a dispute regarding child custody.  Officers
remained at the apartment while REYES removed some of his
property.

### 6.   Three calls on March 5, 2016

126. On March 5, 2016, at 1:26 a.m., REYES called SAPD
requesting a welfare check on Claudia, who had not been
answering his phone calls.  REYES explained that he was supposed
to drop off their son at 6:30 p.m. because he and Claudia were
currently separated.  Officers met with REYES and stood by the
apartment as he opened the door.  Claudia was not at home and
the officers concluded there was nothing suspicious inside.

127. On March 5, 2016, shortly after the early morning call
to SAPD, REYES called the Orange Police Department to file a
missing person report.  An officer arrived at SUBJECT PREMISES 2
and spoke with REYES.  REYES told the officer that he had been
living with Claudia and their son in their apartment in Santa
Ana until their separation approximately one week prior.  REYES
explained he was staying with his mother at SUBJECT PREMISES 2
while Claudia remained at the apartment.  REYES told the officer

that he had gone to the apartment the previous day to retrieve
some of his personal property.  During that visit, REYES alleged
that he and Claudia agreed that he would bring their son to
SUBJECT PREMISES 2 while she worked.  Later that day, he
attempted to call Claudia numerous times, but she did not
answer.  REYES told the officer that he was concerned because it
was unusual for Claudia not to answer his calls.  REYES told the
officer that Claudia attempted suicide about four months ago.
(OCVGTF has not found any evidence that Claudia attempted
suicide.)

128.  On March 5, 2016, at about 8:00 a.m., REYES called
SAPD again requesting an officer to stand by while he allowed
Claudia into the apartment on Bush Street to see their son.
Officers arrived and documented in the call that Claudia was not
present and did not visit the child while they were there.

7.   March 15, 2016 TRO

129.  On March 15, 2016, Claudia obtained a TRO against
REYES.  I read the Request for Domestic Violence Restraining
Order and Claudia's declaration in support of the Request.  In
the Request, Claudia asked the court to order REYES to go to a
52-week "batterer intervention program."  She described an
incident on March 8, 2016, where REYES took a potato peeler and
threatened to kill himself if she did not reconcile with him.
In her declaration, Claudia recounted an incident, just prior to
the couple's separation, on February 22, 2016, at a laundromat.
Claudia said REYES got upset with her for not bringing the
laundromat card and struck her in the arm, which left a

noticeable bruise.  Claudia attached the photos of her injury to her restraining order declaration.  Claudia said that on or about February 28, 2016, REYES pushed her and took her cell phone when she refused to move in with his mother at SUBJECT PREMISES 2.  Claudia noted that her son "did not like staying with [REYES'] mother," and that she did not want to live with REYES mother, which prompted REYES to "scream very loud," push Claudia, and slam her cell phone on the floor.  Claudia related other incidents of abuse against her and E. by REYES, and concluded her declaration stating, "I am frightened that my husband will hurt our son, me and/or himself.  He is very violent and has a quick temper when things don't go his way."

130.  In this same declaration, Claudia referred to the first TRO she had obtained against REYES in August 2014.  Claudia stated that after she obtained the restraining order, REYES threatened to take their son and kill himself if she did not dismiss the restraining order.  As a result of REYES' threat, Claudia said she dismissed the restraining order in September 2014 out of concern for her son.

131.  On or about April 18, 2016, the TRO was continued to May 3, 2016.  In her amended declaration that I read, Claudia said that REYES came to the apartment on April 11, 2016.  REYES told Claudia he wanted to get back together with her and then threatened to upload naked pictures he had of her onto Facebook.  (This was the day before REYES paid A.V. $300 to steal Claudia's phone.)

132. In the background questionnaire verified by REYES in August 2020 for his job at USCBP that I reviewed, REYES was asked if had been a "party to any public record civil court action" in the last ten years.  Like his answer in 2015, REYES again answered no, despite being subject to two domestic violence TROs in 2014 and 2016, mentioned above.

### J.  Claudia's Facebook Account Changed Prior to Her Disappearance

133. During this investigation, I obtained search warrants for records, messages, photos, and other content related to the Facebook profiles of "Claudia Sanchez," "Claudia Reyes," and "Eddy REYES."

a.  A review of the "Claudia Sanchez" Facebook profile showed numerous pictures of Claudia and E.  In more than 1,500 pages of records attributed to the "Claudia Sanchez" Facebook profile, only one picture was posted showing REYES, who was in the background.  Furthermore, only one message was found between REYES and Claudia.  The message, dated March 4, 2016, said in Spanish, "We have to speak Claudia and we have to agree on something.  Remember we have a child in common."  It appears that Claudia did not respond to REYES' message via Facebook.  During the interview at his lawyer's office, described above, REYES said he was blocked from the Claudia Sanchez Facebook account.  He said that Claudia opened the Claudia Reyes Facebook account because she lost her password to the account.

b.  The "Claudia Reyes" Facebook account was registered on May 1, 2016, five days before Claudia's

disappearance.  Between May 3, 2016, and May 6, 2016, numerous
pictures of E., Claudia, and REYES were posted on this Facebook
page.  In contrast to the "Claudia Sanchez" Facebook account, at
least four pictures on this new page were of REYES and Claudia
together.  One of the photos appears to have been taken inside
the rented Hyundai Santa Fe showing a smiling Claudia and REYES
with E. in the background.  This photo was uploaded on or about
May 5, 2016, at 9:48 p.m.

134. Based on my review of the records, Claudia used the
Claudia Sanchez account regularly for more than a year.  I know
from experience and speaking with other law enforcement officers
that a lost or forgotten password for a Facebook account is
easily replaced by clicking on a link.  Based on these facts,
and the stark difference between the content of the two
accounts, I believe REYES created the new Claudia Reyes account
in preparation of kidnapping and killing Claudia.  Controlling
her Facebook account would allow REYES to monitor any efforts of
co-workers, friends, or her lawyer to contact Claudia at the
time of the kidnapping and in the hours and days that followed,
to support his story that Claudia had left REYES and their son
for another man.

**K.    Report of Sighting of Claudia on May 8, 2016**

135. On May 17, 2016, SAPD Homicide Detectives Capacete and
Gomez interviewed Adriana Parada Arzate, a neighbor of Claudia
and REYES at the Bush Street apartments.  According to their
report, Adriana believed she last saw Claudia in the parking
structure of their apartment complex on Mother's Day, May 8,

2016.  (This date was two days after Claudia was last seen by her coworkers at El Pollo Loco and the day after REYES said he last saw her after dropping her off at a McDonald's in Santa Ana.)  Adriana stated that Claudia appeared upset and did not seem to be her usual self.  Later the same day, Adriana noticed that Claudia's Facebook account, listed under profile name "Claudia Sanchez," was no longer active.  On or about May 10, 2016, Adriana found a new Facebook account for Claudia under her married name "Claudia Reyes."  As she looked through the page, Adriana noticed that the new profile had a few pictures of Claudia, E., and REYES.  Adriana found it odd that Claudia would change her Facebook account.  Adriana sent Claudia several messages on her new Facebook profile, but never received any replies.

136. Adrianna was interviewed again on February 17, and March 9, 2021.  She said she last saw Claudia on May 8, 2016, at around 11:00 a.m., when Adriana was coming back from work.  Adriana said Claudia was coming out of elevator lobby with REYES and their son.  Claudia remained to speak briefly with Adriana while REYES and the boy waited in their car.

137. Surveillance camera videos for the apartment garage and elevator lobby/entry for May 8, 2016, were reviewed on March 8 and 9, 2021, by SAPD Police Investigative Specialist Georgina Chacon.  The review showed the following images of Adriana Arzate beginning midnight May 7, 2016:

    a.   At midnight on May 7, Adriana's black Honda Element is not in its assigned parking stall.

b.   At 1:03 a.m. on May 8, the black Honda Element arrives – both Adriana and husband exit the car.

c.   At 1:04 a.m., Adriana and her husband are seen walking through the entry way towards the stairs.

d.   The vehicle does not move until 7:00 a.m. when Adriana's husband is seen walking from the stairs, checks the mailbox, and walks to the parking garage alone, and at 7:03 a.m. gets into the Honda and drives out of the garage.

e.   At 7:05 a.m., Adriana is seen walking from the stairs and out the front glass door to the street where the black Honda Element is waiting for her.  She gets into the car and it drives away.

f.   The black Honda Element is next seen at 9:40 a.m. when it drives through the parking garage and parks in its assigned spot.  Adriana and her husband get out of the car and Adriana walks towards the elevator lobby alone holding a plate and bag.  Moments later, Adriana's husband walks into the elevator lobby holding a bag.

g.   At 10:25 a.m., Adriana, her husband, and two children are seen walking from the stairs towards the parking garage.  The family gets into car and drives away.

h.   The Honda is not seen again until 9:50 p.m. that night when it is seen driving into the garage and parking in its assigned spot.

i.   At 9:51 p.m., Adriana and her family are seen walking through the entry way up the stairs.

At no point on May 8 does Adriana or any of the family members
stop to talk to anyone.  Claudia and REYES are not seen at any
point on the video.  A clip of the video was sent to Adriana's
husband, who confirmed it was his family depicted in the video.
Because the video of May 8 shows that Adrianna came and went
that day without speaking to anyone, and REYES' phone records
show his phone left the area of the Bush Street apartment by
5:48 a.m. that morning, and left the area of SUBJECT PEMISES 2
around 8:30 a.m. for the Salton Sea, I believe she last saw
Claudia, REYES, and their son prior to May 8.  In her initial
interview, she said she was not certain that it was May 8,
though she later said she was sure it was that day.

### L.   REYES' meeting with Pablo Orellana After Police Interview Orellana

138. On June 8, 2017, SAPD Homicide Detectives Judson and
Capacete went to the residence of Pablo Orellana to interview
him regarding his whereabouts when Claudia disappeared.
Orellana stated that he did not have a good relationship with
his mother, Maria Orellana, or his brothers, Roy and REYES.
Orellana said he had a better relationship with REYES than Roy,
and had last seen REYES a few months after his mother's death in
August 2016.  Orellana told Detectives that he knew REYES
married a woman from El Salvador named "Laura."  Orellana knew
that REYES brought his wife to the United States after they got
married in El Salvador, but he said that he did not see her in
the United States.  According to Orellana, REYES told Orellana
that his wife had left him, and that police had spoken to him

about her leaving.  When asked about his camping trip on Mother's Day with his mother and REYES, Orellana acknowledged going to Salvation Mountain to spend Mother's Day together. Orellana said they went to the camping area in a rental car, which they also used to sleep inside at night.  Orellana identified Wilfredo Cruz as his wife's brother who lived in Palmdale, California.  Orellana told Detectives that Cruz was a pastor and how he would often go to Cruz's house to pray. According to Detective Judson, he and Detective Capacete were at Orellana's residence from about 11:00 a.m. until approximately 12:30 p.m.

139. At approximately 11:45 a.m., during the time the Detectives were at Orellana's home, REYES' line received a call from a female identified as "Vero," believed to be Pablo Orellana's wife, Ana Veronica Orellana, using phone number 310-990-7717.  The call was monitored pursuant to a state wiretap order on REYES' number that I obtained on June 2, 2017.  Vero told REYES that the police were at her home investigating the disappearance of Claudia.  Vero said the police talked to Orellana, but Vero did not know what Orellana told them.  Vero asked how the police got Orellana's address and asked if REYES had given it to them.  REYES said he did not give it to them and didn't know how they got it.  Vero told REYES that the police were there about 5 minutes ago but was not sure if they were still there.

140. Vero told REYES that she knew that he and Orellana were not on good terms but did not think Orellana would say

anything that could hurt REYES.  Vero told REYES that she could give him Orellana's number, but Vero did not want Orellana to get upset with her.  REYES told Vero that he did not have anything to hide and hoped that they (the police) would find Claudia.  Vero said if the police interviewed Orellana it was because they were still investigating the case.  Vero then asked if REYES knew anything about the girl (Claudia), to which he replied that he did not.  Vero then asked if he had heard anything from El Salvador.  REYES replied, "I don't know anything, Vero, I don't know anything, you understand?  I'm not in good health, my health is really bad."  Vero told REYES it would be good for REYES to find out if the girl (Claudia) was in El Salvador so that REYES could be at peace.  REYES thanked Vero before concluding the call.

141. Later the same day, at about 5:56 p.m., REYES spoke to Vero by telephone and asked about his brother's health, presumably asking about his half-brother Pablo Orellana.  Vero stated that he was okay and recovering from surgery.  REYES then asked Vero to have Orellana call him.  Vero said she was at Raquel's graduation but would tell Orellana later that evening.

142. On June 8, 2017, at approximately 9:15 p.m., REYES' phone received a text from phone number 323-270-4297.  In the text, the sender asked REYES when he could pick him up.  REYES responded that it would be an hour-and-a-half.  Based on the results of a database search I conducted, and the fact that REYES subsequently picked up Pablo Orellana, I believe the number 323-270-4297 belonged to Pablo Orellana.

143. At about 9:22 p.m., members of the OCVGTF established surveillance at SUBJECT PREMISE 2.  At about 9:35 p.m., TFO Zuniga watched as REYES' Corolla began to back out of the driveway.  TFO Zuniga watched as REYES slowly drove southbound on Park Vine Street before stopping and making an abrupt U-Turn. REYES' vehicle then drove back northbound on Park Vine Street past SUBJECT PREMISE 2 and out of view of surveillance units in what was believed to be a counter-surveillance tactic.  REYES was then followed to Los Angeles, where REYES picked up Pablo Orellana and drove to Tacos El Gavilan at 4380 South Broadway Street in Los Angeles.

144. TFO Zuniga and SAPD Detective L. Barragan, in an undercover capacity, walked into the restaurant and saw REYES and Pablo Orellana sitting in a booth in the extreme southwest corner of the restaurant.  Detective Barragan and TFO Zuniga ordered some food and sat in the booth immediately north of where REYES and Orellana were seated.  REYES was facing south (with his back to TFO Zuniga) and Orellana was facing north.

145. At about 11:30 p.m., TFO Zuniga activated a surreptitious recording device and placed it on the table to his left.  The restaurant had a lot of ambient noise, such as music being played and customers' orders being called out over a loudspeaker, making it difficult to hear.

146. TFO Zuniga could faintly hear REYES and Pablo Orellana speaking.  As he continued to listen, TFO Zuniga determined that REYES and Pablo Orellana would lower their voices or whisper as though they did not want others to overhear.  TFO Zuniga

believed this because, during other portions of their conversation, REYES and Orellana spoke freely and loud enough for TFO Zuniga to hear clearly.

147. Despite the difficulties, TFO Zuniga did hear a portion of the conversation where REYES asked Orellana in Spanish what he said today, presumably referring to Orellana's interview with SAPD Detectives earlier that day.  Orellana then asked REYES the same question, that is, what REYES said to the police, before telling REYES in Spanish, "Tu, no digas nada [You, don't say anything]."  TFO Zuniga could not hear what immediately preceded this statement by Orellana as both were speaking in a very low tone.  Orellana told REYES that "they" came to speak to him earlier and asked him about a certain place.  Orellana told REYES that he told them they went "there to pray," a possible reference to the trip to Salvation Mountain when Claudia disappeared.  The conversation then transitioned to REYES discussing a recreational vehicle and going to Big Bear. TFO Zuniga noted that this conversation was much easier to hear.

148. At about 12:07 a.m., Orellana lowered his voice again as he asked REYES if he had spoken to "Pri," a typical abbreviation for the Spanish word "primo," usually a cousin or associate.  TFO Zuniga could not hear REYES' reply because he again lowered his voice considerably.  I believe that "Pri" may be a reference to Wifredo Cruz, Orellana's brother-in-law. REYES and Orellana went to the residence of Wilfredo Cruz in Palmdale on the evening of May 26, 2016, after REYES had picked up Orellana at the hospital, described above.

**M.   REYES' Remarriage in April 2017**

149. Based on public records I reviewed, on April 17, 2017, a Declaration for Default or Uncontested Dissolution was filed by REYES.  A judgment dated June 13, 2017 granted REYES the dissolution of his marriage to Claudia.

150. Through surveillance conducted in May 2017, it appeared that REYES was living with a woman named Carla Velez. On June 29, 2017, SA Shea and I approached Carla Velez to interview her as she was leaving the garage at SUBJECT PREMISES 2.  Carla said she met REYES at the Cuerpo de Cristo Church in Los Angeles, around September 2016.  After dating for a short period, Carla said that they were married in the church in April 2017, and again at a courthouse in Huntington Park on June 17, 2017, after REYES told Carla that he needed to go to court to take care of some legal paperwork involving his son.  When we spoke with Carla, she did not know that his divorce from Claudia was not finalized until June 13, 2017, after their first marriage in April 2017.

151. When asked about Claudia, Carla replied that REYES told her he had problems with Claudia due to her infidelity and that they had not been together for about 3 years.  REYES also told Carla that he spoke to Claudia by phone and asked her to speak to E., but Claudia allegedly refused to talk to her son. Carla could not give an approximate date for the alleged phone call but gave the impression that it took place after Claudia disappeared.  Carla said that REYES never notified SAPD or Claudia's family about this conversation despite having filed a

missing person's report.  Carla stated that E. occasionally
asked about his mother, with the most recent occurrence being
about a month prior to the date of this interview.

### N.   REYES' Failed Polygraph Examination in November 2015

152. In July 2020, SA Altamirano and I were told by USCBP
SSA Trevino that REYES failed a polygraph examination in 2015 as
part of the application process after applying to become a USCBP
Officer.  According to SSA Trevino, REYES did not reschedule a
second polygraph and did not become an officer.

153. On or about September 1, 2020, polygrapher Peter Ruth
was interviewed by SA Trevor Twitchell.  The interview report
included the following:

a.   According to the interview report, on November
12, 2015, Ruth administered an examination for REYES as part of
his application process to become a USCBP Officer.  RUTH
specifically remembered this exam because REYES told Ruth that
he had taken and withheld identification and travel documents
belonging to his wife, Claudia, so she could not leave REYES.

b.   During REYES' polygraph examination, REYES
exhibited a Significant Response ("SR") to questions about
REYES' involvement in a serious crime.  Based on my training and
experience, I know that an SR is determined based on several
physical reactions to certain questions.  If an SR is
identified, the polygraph examiner will give the subject an
opportunity to explain or clarify any answers.

c.   Ruth determined that REYES did not pass the
polygraph examination due to the SRs.  When asked about his SRs,

REYES mentioned domestic disputes he had with his wife, Claudia. REYES told Ruth that within the last few months, the SAPD had visited REYES' home on two separate occasions in response to domestic issues.  When Ruth asked about the domestic incidents, REYES explained that they were the result of his wife, Claudia, wanting to return to her native El Salvador after the death of her brother.  (According to a report from National Civil Police in El Salvador, in June 2013, Claudia's 15-year-old brother was shot in the chest in the backyard of his parent's home and later died in the hospital.)  REYES told Ruth that he and his wife had threatened each other with divorce.  REYES said his wife wanted to divorce REYES and take their son back to El Salvador.  In response to that threat, REYES took identity documents of his wife and son to prevent them from leaving the country.  REYES explained to Ruth that he felt bad about taking the documents but did not think it was criminal behavior.  REYES also revealed that his wife had TROs issued against him.  When asked if REYES had ever hit his wife, REYES claimed he had never struck her, but said he had held his wife's arms so that she would stop hitting him.

       d.  Ruth asked REYES why he had not included any of that information in his application.  REYES told Ruth that he did not think he needed to include the information in the application because REYES had never been charged with anything or gone to jail.  REYES also explained that the restraining order had been rescinded by his wife and their marriage was going very well at the time of his polygraph examination.

e.    Another item that stood out to Ruth was that
REYES had not included his two half-brothers, including Pablo
Orellana, and grandfather in REYES' background application form.
The form clearly instructed REYES that all family members had to
be included.  REYES told Ruth about the three additional
individuals during the polygraph interview after being asked if
REYES had any additional information to add to what he had
listed in his application.

### O.    April 2016 Letter from REYES to ICE Withdrawing Application for Residency for Claudia

154. On or about January 12, 2021, USCBP SSA Trevino told
me that she had recently reviewed Claudia Reyes' Alien File, or
A-File.  Within Claudia's A-File, SSA Trevino found a letter
from REYES that was filed on or about April 19, 2016, which is
approximately three weeks prior to Claudia's disappearance.

155. I read the letter.  REYES wrote, "the purpose of this
letter is to withdraw the application for U.S. Residency for my
wife Claudia Lisseth Sanchez Reyes due to infidelity and
physical and emotional abuse that she has caused me, my son and
my mother."  REYES claimed that Claudia had been cheating on
REYES with someone by the name of "A. Zaa," presumably Claudia's
coworker, W-1, from the time she arrived in the United States on
March 17, 2014, until the time of the letter.  (As noted above,
Claudia worked at El Pollo Loco, where she met W-1, for only
approximately six months before her disappearance in May 2016.)
REYES claimed that he learned of her infidelity through a family
member who was able to access Claudia's Facebook profile.  REYES

also wrote of witnesses who had seen Claudia "kissing, hugging and holding hands with another man outside of El Pollo Loco." REYES wrote in the letter, "My wife has clearly no respect for the marriage, immigration laws that bind us together or the legal system for engaging in acts of infidelity in front of our son while attempting to obtain residency in this country."

156. REYES accused Claudia of attempting to return to El Salvador with their son and claimed that she was a mentally unstable person, who has tried to take her own life by "self mutilating her arms in front of our son." REYES wrote that he had pictures of Claudia's self-harm, but did not attach them with his letter. REYES stated that he and Claudia were going through a divorce and child custody hearing at the Lamoreaux Justice Center in Orange County, where he planned to "show evidence of her physical and emotional abuse towards me, our son and my mother." This evidence has never been shown to the SAPD.

157. At the conclusion of the letter, REYES accused Claudia of making "false allegations of domestic violence" in an effort "to falsely obtain residency in this country because I would not file I-751." An I-751 form is a petition used by a conditional resident, who obtained their status by marriage, to request that the U.S. Citizenship and Immigration Services remove the conditions on their residency. Based on my training and experience, REYES' withdrawal of the application for U.S. Residency could have resulted in Claudia's eventual deportation while simultaneously giving REYES sole custody of E.

P.    **Probable Cause as to the SUBJECT PREMISES**

1.    SUBJECT PREMISES 1

158. There is probable cause to believe that SUBJECT PREMISES 1 is REYES' current residence and that evidence pertaining to the disappearance of Claudia Reyes may be found there.  REYES listed 20983 East Covina Boulevard #E, Covina, California, as his current address in USCBP records.  The FBI conducted surveillance at SUBJECT PREMISES 1 on five occasions between August 7, 2020, and September 3, 2020.  Each time, a Honda Odyssey registered to REYES was parked close to SUBJECT PREMISES 1.

159. With respect to evidence that may be found at SUBJECT PREMISES 1:

a.    None of REYES' cell phones or computers have ever been searched for evidence related to Claudia's disappearance. Even if REYES deleted evidence from any devices he still has from that time, I know from speaking with forensic investigators that deleted files can sometimes still be recovered regardless of the passage of time.  In addition to his own cell phones, REYES may still have the cell phone he paid to have stolen from Claudia, or the phone he got for her after the robbery.  As set forth above, REYES used digital devices to communicate with others concerning Claudia, including A.V. – the person whom REYES paid to steal Claudia's phone – and his half-brother. Also set out above, it appears that REYES accessed and used Facebook to further the kidnapping offense.

b.    Aside from digital devices, there may be
clothing, furniture, or other personal items that may yield
evidence.  Except for a few personal effects REYES brought to
his attorney's office for the purpose of establishing Claudia's
DNA profile, law enforcement has not located her other property.
Clothing and furniture from the Bush Street Apartment where
Claudia last lived, or from SUBJECT PEMISES 2 when REYES lived
there, may be in SUBJECT PREMISES 1.  As noted above, the
apartment manager for the apartment told SAPD Detectives that
REYES vacated the apartment he shared with Claudia on May 15,
2016.  After that date, furnishings were seen in the garage of
SUBJECT PREMISES 2 during surveillance operations.  On June 1,
2016, TFO Becerra saw numerous pieces of furniture and
appliances in the garage, including a refrigerator, stackable
washer/dryer, mattress and box spring.  TFO Becerra noticed
other furnishings that were covered by sheets to keep them
clean.  During numerous other surveillance operations conducted
on SUBJECT PREMISES 2, TFO Zuniga and I noticed what appeared to
be the outline of a couch covered by a sheet inside the garage.
Based on USCBP records, REYES lived in SUBJECT PREMISES 2 until
March 2018.  His next listed address was an apartment in Bell
Gardens from March 2018 to January 2020.  He then moved to
SUBJECT PREMISES 1.  I believe that some of the furnishings
REYES kept in the garage at SUBJECT PREMISES 2 may have been
moved to SUBJECT PREMISES 1.  Beyond the above, as previously
noted, the Bush Street apartment manager, Plata, said that when
REYES returned to the apartment on May 15, 2016 to remove their

property from the apartment, Plata noticed that REYES appeared
to take extreme care when he moved the couch out of the
apartment – suggesting that REYES intended to reuse the couch
and other furniture in a future residence.  Based on my training
and experience, and discussions with the FBI's Evidence Response
Team ("ERT"), I believe that if any of the belongings removed
from the Bush Street apartment are found in REYES' current
residence, forensic evidence may still be recovered from them.

2.   SUBJECT PREMISES 2

160. There is probable cause to believe that SUBJECT
PREMISES 2 may contain evidence relevant to the disappearance of
Claudia.  It is where REYES took Claudia when she disappeared.
REYES listed 835 South Park Vine Street, Orange, California in
USCBP records as his residence from May 2016 until March 2018.
During numerous surveillance operations conducted after
Claudia's disappearance, REYES and his half-brother, Pablo
Orellana, were observed arriving to and leaving from SUBJECT
PREMISES 2.

161. Since the beginning of this investigation, SUBJECT
PREMISES 2 has not been searched or processed for forensic
evidence by either the FBI or SAPD.  According to a police
report I read, in February 2018, the Orange Police Department
conducted a welfare check at SUBJECT PREMISES 2 after receiving
a report from Lampson Elementary School that E. had not been to
school in a week.  Carla Velez initially refused to open the
external metal security screen to speak to the officers
directly.  After about a minute, Carla agreed to come outside to

speak to the officers.  As Carla exited the residence, she abruptly shut the front door behind her, thus preventing the officers from being able to see inside the residence.

162. Recently, SA Altamirano and I spoke to a member of the FBI's ERT regarding the team's capabilities and whether forensic evidence could be obtained from floors and surfaces within SUBJECT PREMISES 2 despite the time that has passed.  We were told that forensic evidence, such as DNA or traces of blood, could still be present at SUBJECT PREMISES 2 even if painting and re-carpeting were done since REYES moved out.  The ERT member told us the ERT can identify and preserve any forensic evidence still present in SUBJECT PREMISES 2.  Furthermore, SA Altamirano and I were told that FBI ERT has devices to check in the backyard if evidence was buried.

163. Based on my review of public records, SUBJECT PREMISES 2 appears to be owned by an LLC controlled by Roy Reyes. However, surveillance has shown that SUBJECT PREMISES 2 appears to be currently occupied by a couple and a child.  From surveillance, there did not appear to be any connection between the current occupants of SUBJECT PREMISES 2 and the Reyes family.  Accordingly, the premises to be searched described in Attachment A-2 is limited to (1) the walls and flooring inside SUBJECT PREMISES 2, including the garage, for the use of forensic techniques to search for trace amounts of blood or DNA; and (2) the backyard and any side yard of SUBJECT PREMISES 2, for use of forensic techniques to locate any human remains or other evidence buried on the property.

164. Prior to any search, the agents will explain to the occupants that they have a search warrant, but that the occupants are not connected to the suspected crime.  The occupants will be asked if new flooring, carpeting, or walls have been installed, in which case any surfaces installed since May 2016 would not be searched.  The occupants will be told that their personal property, e.g., clothing, furnishings, records, is not subject to the warrant.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

165. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

_____

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

166. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

167. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Eddy REYES' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Eddy REYES' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    168. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VI. <u>CONCLUSION</u>

169. For all the reasons described above, there is probable cause to believe that Eddy REYES violated 18 U.S.C. § 1201(a)(1) (kidnapping).

170. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence of the kidnapping will be found at the SUBJECT PREMISES, as described in Attachments A-1 and A-2.

/s/
_____
FARSHID HASHEMPOUR
Task Force Officer
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
April, 2021.

**DOUGLAS F. McCORMICK**
_____
UNITED STATES MAGISTRATE JUDGE